# STATE OF MARYLAND *vs.* HENRY A. BROAD-BELT.

*Constitutional Law—Police Power—Inspection of Dairies and Milk—Registration of Herd—Equal Protection of the Law.*

The provision of the Fourteenth Amendment of the Federal Constitution, that no State shall deny to any person the equal protection of the law, is not to be construed as meaning that every person shall possess the same rights and privileges as every other person. In the exercise of its police power a State may lawfully prescribe regulations for certain classes of persons to which other persons are not subject, provided the classification is based on reasonable grounds.

The Act of 1898, ch. 306, prescribing certain sanitary regulations to be observed by dairymen who supply milk to cities, towns and villages, makes a reasonable classification of persons by whom the sale of impure milk would be especially injurious to the public, and the Act being applicable to all persons of that class, is valid, although other persons selling milk to individuals in the country are not included within its regulations.

The Act of 1898, ch. 306, provides, that all dairymen supplying milk to cities, towns or villages, shall register their cattle with the Live Stock Sanitary Board; that the board shall inspect the premises where cows are kept, which premises must be used and maintained in conformity with the rules laid down in the Act relating to ventilation, drainage and cleanliness. Power is given to the board to prohibit the shipment of milk from dairies not kept in conformity with these rules, and a fine is imposed for any violation of the statute. Defendant, a dairyman, was indicted for having failed to register his cows. *Held*, that the Act is a valid exercise of the police power of the State, designed to protect the public health from the dangers arising from the sale of contaminated milk, and does not operate to deprive defendant of any right without due process of law, within the meaning of the Constitution

Appeal from a judgment of the Criminal Court of Baltimore (SHARP, J.), sustaining a demurrer to the indictment.

The cause was argued before McSHERRY, C. J., FOWLER, BRISCOE, BOYD, PEARCE and SCHMUCKER, JJ.

*George R. Gaither, Jr., Attorney-General,* and *Richard M. Venable,* for the appellant.

The XIV Amendment has not taken from the States the police power reserved to them at the time of the adoption of the Constitution of the United States. *Slaughter House cases*, 16 Wall. 36; *Barbier* v. *Connolly*, 113 U. S. 27; *Mugler* v. *Kansas*, 123 U. S. 623. The particular section of the Act on which this indictment is based is the one (section 19) requiring the registration of cattle. It in no way infringes on any right of property. But section 20 provides the methods of keeping stables and cows and for their inspection. These provisions do to some extent infringe on private property rights; but they provide for an invasion of private rights much less radical than the cases show to be permissible under the police power. *Deems* v. *Baltimore*, 80 Md. 164, 173–4; *Powell* v. *Pennsylvania*, 127 U. S. 678; *Wright* v. *State*, 88 Md. 436; *Johnson* v. *Simonton*, 43 Cal. 225; *Slaughter House cases*, 16 Wall. 36; *Lawton* v. *Steele*, 152 U. S. 133. But it is further claimed, and the Judge below so held, that the Act was unconstitutional under the provision of the United States Constitution, Amendment XIV, section 1, forbidding a State to "deny to any person within its jurisdiction the equal protection of the law." When this clause first came to be construed by the Supreme Court, it was held to be primarily designed to protect the recently enfranchised freedmen from discriminating legislation. *Slaughter House cases*, 16 Wall. 36. And that Court has continuously so construed this clause as to leave the States great freedom in legislation, and not to give the Supreme Court or the Federal Government any general supervisory power over State legislation. *Cooley's Principles of Const. Law*, 249, citing *Soon Hing* v. *Crowley*, 113 U. S. 703; *Hayer* v. *Missouri*, 120 U. S. 68; *Home Ins. Co.* v. *New York*, 134 U. S. 594; *Pembina Mining Co.* v. *Pennsylvania*, 125 U. S. 181; *Crowley* v. *Christensen*, 137 U. S. 86; *Marchant* v. *Penn. R. R.*, 153 U. S. 380; *Jones* v. *Brim*, 165 U. S. 180; *Barbier* v. *Connolly*, 113 U. S. 27.

It is conceded that persons cannot be arbitrarily deprived

of life, liberty or property, or denied the equal protection
of the laws because the State professes to be exercising the
police power.   The State's determination as to what is a
proper exercise of the police power is subject to the super-
vision of the Courts.   *Lawton* v. *Steele*, 152 U. S. 133, 137.
But if the object to be accomplished is conducive to public
interests much must be left to the discretion of the Legis-
lature, and it may exercise a large liberty in the choice of
means employed.   *Lawton* v. *Steele*, 152 U. S. 133.   The
manifest object of this statute is to protect health by secur-
ing a pure supply of milk, and the particular purpose of the
Act is to remove impurities arising from keeping milch
cows in unsanitary conditions.   This Court has already
recognized milk as a special source of disease, and has sus-
tained rigid and peremptory regulations for preserving its
purity.   *Deems* v. *Baltimore*, 80 Md. 164, 173–4.   The
reasonableness of the purpose of the Legislature is conse-
quently not now open to question.   The class regulated by
the Act is all persons supplying milk to cities, towns and
villages who keep milch cows.   No valid objection to the
Act can be made on the ground that it does not apply
equally to all the members of the class ; it expressly applies
to " *all* dairymen or herdsmen or private individuals, &c."
The class specially regulated by this statute is a reasonable
and just class for the purposes of the legislation ; it is per-
sons supplying milk to cities, towns and villages and keep-
ing milch cows.   The grounds on which permissible classi-
fications for legislative regulation may be made are elabo-
rately discussed and cases reviewed in *Gulf, Colorado, &c.,*
*R. R.* v. *Ellis,* 165 U. S. 150, 155, 165.

The classification " must rest on some difference which
bears a reasonable and just relation to the Act in respect to
which the classification is made ;" it must furnish a reason-
able basis for separate laws—a natural basis growing out of
the particular business.   *Gulf, Colorado, &c., R. R.* v.
*Ellis,* 165 U. S. 150 ; *Barbier* v. *Connolly,* 113 U. S. 27, 32.

The Legislature may even select, out of those engaged in

a particular business, a special class, and make special regulations in reference to it, where in reasonable judgment there is ground for segregating the class. Thus, a statute making railroads, and not other common carriers, even though they may use fire as a means of locomotion, absolutely responsible for damages communicated by its locomotives, is constitutional. *St. Louis, &c., Rwy.* v. *Mathews,* 165 U. S. 1. So a statute making railroads and no others liable for double damages for injuries to cattle was sustained *Missouri Pacific R. R.* v. *Humer,* 115 U. S. 512, 523 ; *Minneapolis, &c., R. R.* v. *Beckwith,* 129 U. S. 26 ; *Minneapolis, &c., R. R.* v. *Emmons,* 149 U. S. 364. So a statute confined to railroads and making them liable to employee for injuries arising from negligence of fellow-employees. *Missouri Pacific R. R.* v. *Mackey,* 127 U. S. 205. And so the retail sale of liquor, as distinguished from other sales, may be specially regulated. *Crowley* v. *Christensen,* 137 U. S. 89. See also *Jones* v. *Brim,* 165 U. S. 180.

In the present case, the purpose of the Legislature is highly commendable—to prevent impurities in milk, from keeping cows in unsanitary conditions. It was not practicable to regulate the keeping of all milch cows, and the regulation was confined to those furnishing milk for sale. In the case where sales were made in the country from neighbor to neighbor, or occasionally, the matter was either not capable of regulation or the Legislature thought that purchasers could protect themselves. The thing to be prevented was the poisoning of milk supplies put on the market from a special source of contamination. The method was reasonable, although other sources of contamination were not provided against, and all possible contamination from this source not provided against. If to-day we were called on to provide by legislation against impurities arising from the improper keeping of milch cows, we could not present a better plan. It would be impracticable to regulate the keeping of all milch cows, just as it is to regulate the inspection of all milk. We could only look to that coming

into the market liable to be rendered impure from this source. It would not be practicable to comprehend, in the regulation, cow stables from which occasional or neighborhood sales were made, as it would be impracticable to inspect milk thus sold. In such cases persons would have the knowledge or means to protect themselves. The bad results would be more circumscribed and more traceable to their source. The class to be regulated would thus be confined to those making a business of supplying milk in quantities, or to be mixed with milk where it is supplied in quantities. What better or more reasonable definition could be given of this class than persons who keep milch cows for furnishing milk to cities, towns or villages?

The objection urged to the Act is that it does not create a reasonable class ; and this for certain reasons : 1. Because it does not include persons supplying milk to cities, towns and villages who do not keep milch cows. This objection cannot be maintained ; because the whole object of the Act is to regulate the method of keeping milch cows, and such regulations, of course, could not be applied to persons not keeping them. Another method of regulation would apply to that class of cases.

This objection would apply equally to any class, and would strike down a large part of the fabric of State law. Every local law for any county, city, town or village, protects only those in defined geographical limits, and does not reach those outside of such limits. The same is true of every regulation of any trade or profession. " Nor does the amendment prevent special legislation. Indeed, the greater part of all legislation is special, either in the extent to which it operates, or the objects sought to be attained by it." *Home Ins. Co.* v. *N. Y. State*, 134 U. S. 594, 606.

2. Because it does not furnish protection to persons not residing in cities, towns or villages. A like objection might be made to all local inspection laws or health laws. An Act for the protection of the health of persons residing in

special localities can in no sense be said to deprive persons not residing in those localities of the equal protection of the laws.

3. Because it does not apply to persons keeping milch cows who may supply milk, but not to towns, cities or villages. In these cases the Legislature deemed the matter incapable of regulation, or felt that such supplies were a small part of the evil, and the conditions were such that the purchasers could protect themselves. It is submitted that as in the case of *Jones* v. *Brim*, 165 U. S. 180, the lawmaker made a class reasonable and practicable for the end in view. It would not be practicable to extend the regulation to all persons keeping cows who occasionally or regularly supplied milk to one or more neighbors in the country. The class is reasonable because practicable, and reaches the great source of the evil to be corrected. If the Legislature should regulate medical institutions or physicians who kept cultures of disease germs, it would not be obnoxious to objections because some other persons might keep such cultures. Practically, a class is made of those in the milk business who keep cows. A law providing for the inspection of milk sold in towns, cities and villages would be obnoxious to the same objection.

4. Because it does not protect even the inhabitants of cities, towns and villages from impure milk furnished—(*a*) From sources outside of the State; and (*b*) From milk bought by middlemen residing in the country and shipped into cities, towns and villages. The statute does not protect the people of the State from impurities in milk imported into the State. This can only be done by inspections. But it is not a deprivation of equality to apply these regulations to dairymen in the State when they are not applied to those outside. The enforcement of the regulations may be advantageous to dairymen in the State. Furthermore, a State statute may forbid the manufacture and sale of certain goods in a State, and persons outside the State may, under the Commerce clause of the United

States Constitution, continue to import such goods and sell them, and yet such State statute does not deprive citizens of the State of the equal protection of the law. *Penn.* v. *Schollenberger*, 170 U. S. 1. Nor can it be objected that the persons who may supply milk to country dairymen, to be shipped to cities, towns and villages, are not covered by the Act. They really are covered by it, for the persons who sell milk to them are "supplying milk to cities, towns and villages." And if not, the Act could not be assailed on this ground. If the Act makes a reasonable class, and bears on all of the class alike, it is no objection to it that it does not reach the whole evil desired to be remedied.

*Wm. Pinkney Whyte*, for the appellee.

It is not contended by the traverser that the constitutional guaranty of equal protection of the laws requires that laws should in all cases operate equally on all persons in the State. The power of classification is conceded, and it is also conceded that it is sufficient when classes are created that the law shall operate equally on all persons in the class. The law on this point is well-settled, and the cases are numerous. This discrimination is unlawful. The object of the law is for the benefit of a privileged class, and there is no reasonable ground for such provisions. The State cannot discriminate by imposing upon one class of dairymen, burdensome duties and expenditure, and relieving others of like burdens. The discriminations which are open to objection are those where persons engaged in the same business are subjected to different restrictions, or are held entitled to different privileges under the same conditions. It is only, then, that the discrimination can be said to impair the equal right, which all can claim in the enforcement of the laws. *Soonhing* v. *Crowley*, 113 U. S. 709. Class legislation discriminating against some and favoring others is prohibited, but legislation which, in carrying out a public purpose, is limited in its application, if, within the sphere of its operation, it affects alike persons similarly situated, is not within the amend-

ment. *Barbiere* v. *Connelly*, 113 U. S. 375. See also *Shaffer* v. *Union Mining Co.*, 55 Md. 74; *Butchers' Co.* v. *Crescent Co.*, 111 U. S. 757; *In re Jacobs*, 98 N. Y. 98; *People* v. *Gillson*, 109 N. Y. 399.

The classification made in the Act of 1898 is not a valid classification, and that the traverser is subjected to expensive, unjust and oppressive regulations from which others occupying a precisely similar position are exempt. The contention is that dairymen, herdsmen and private individuals who supply milk to cities, towns and villages have been subjected to regulations which do not apply to other dairymen, herdsmen and private individuals selling milk; in other words, that supplying milk to cities, towns and villages is not a proper foundation for a classification. In the case of *Gulf, Colorado and Santa Fe Rd. Co.* v. *Ellis*, 165 U. S. 150, this subject was fully considered. See also *Bell's Gap R. W. Co.* v. *Pennsylvania*, 134 U. S. 232; *Adams Express Co.* v. *Ohio*, 165 U. S. 194; *W. U. Rd. Co.* v. *Indiana*, 165 U. S. 304; *In re Grice*, 79 Fed. Rep. 627.

In the Court below it was admitted that there are dairymen, herdsmen and private individuals who do not sell milk to cities, town and villages, and that among them are at least the following classes of persons, viz.: Those who sell to persons living in country neighborhoods; those who sell to creameries situated in the country, and which make butter and cheese; those who sell to country storekeepers, and those who sell to middlemen. It is not the existence of the power to pass laws regulating the construction and use of stables and care of cows belonging to persons engaged in selling milk, which is now in controversy; it is the unequal, arbitrary and oppressive manner of its exercise which is complained of. Classification "must always rest upon some difference which bears a reasonable and just relation to the Act in respect to which the classification is proposed, and can never be made arbitrarily and without such basis."

" Under an exercise of the police power the enactment

must have reference to the comfort, the safety or the welfare of society, and it must not conflict with the Constitution. The law will not allow the right of property to be invaded under the guise of a police regulation for the protection of health, when it is manifest that such is not the object and purpose of the regulation." *People* v. *Gillson*, 109 N. Y. 387, 399. There is a limit to the interference of the State with the health and morals of the community, there is a point where the constitutional protection is paramount.

The Act must be adapted primarily to protect the health of the community, and the good it secures must forever overbalance the evil that it does. The regulations must be what they purpose to be, police regulations, and must be reasonable, when applied to corporations or individuals. What are reasonable regulations and what are subjects of police powers, must necessarily be judicial questions. Like other forms of government there are constitutional limitations to its exercise. It is not within the power of the General Assembly, under the pretence of exercising the police power of the State, to enact laws not necessary to the preservation of the health and safety of the community, that will be oppressive and burdensome upon the citizen. If it should prohibit that which is harmless or command that which is unreasonable to be done to promote the health, safety or welfare of society, it would be an unauthorized exercise of power, and it would be the duty of the Courts to declare such legislation void " *Long* v. *State*, 74 Md. 565 ; *Toledo, Wabash & Western R. Co.* v. *City of Jacksonville*, 67 Ill. 37 ; (6th ed.) *Cooley on Con. Lim.*, ch. 16. It places the livelihood of a large class of men at the mercy of a board vested with arbitrary powers.

If every hotel keeper, private family, boarding-house keeper can bring into the State from Pennsylvania and other States, milk from dairies which are not arranged and operated according to this proposed system, what becomes of the argument that the health of the people of the State re-

quires to be protected against milk from dairies not man-
aged like these? *Mimm* v. *Barber*, 136 U. S. 315.

" Due process of law " does not necessarily require a
judicial proceeding, but it is essential that the party whose
property is to be taken shall have notice of the proceeding
and shall have an opportunity to be heard, and that notice
must be such as is provided by law. *Kuntz* v. *Lumption*,
117 Ind. 1; *Vizard* v. *Taylor*, 97 Ind. 91; *Jackson* v. *State*,
104 Ind. 516; *King* v. *Hayes*, 80 Me. 206.

This law makes no provision for notice, and fails to make
any compensation to the owner for the destruction of his
business. And it also makes an unwarrantable delegation
of power to the board. *Yick Wo* v. *Hopkins*, 118 U. S.
369.

McSHERRY, C. J., delivered the opinion of the Court.

The appellee was indicted under the *Act of 1898*, ch. 306,
passed by the General Assembly of Maryland, and entitled
" An Act to add certain new sections to Article fifty-eight
of the Code of Public General Laws, title ' Live Stock,'
under the new sub-title ' Dairies,' to follow section 18,"
&c.   He demurred to the indictment upon the ground that
the statute was unconstitutional.   His demurrer was sus-
tained by the Criminal Court of Baltimore City, the indict-
ment was quashed, and the State has appealed.   The rea-
sons upon which he bases his claim that the statute is void
are, that it denies the equal protection of the laws guaran-
teed by *Sec. 1 of the XIV Amendment* to the Federal Con-
stitution, and deprives the individual of the due process of
law secured by that amendment and by *Article 23 of the
Maryland Declaration of Rights*.   Both of these, or similar,
grounds of attack have of late years been very frequently
resorted to in assailing the validity of State legislation en-
acted in the exercise of the police power, and numerous
judgments have been delivered by the Supreme Court of
the United States in cases where this method of assault has
been relied on.   A review of, or even a reference to, all

these cases would not be practicable within the limits of this opinion, but brief citations, later on, from some of them, will serve to illustrate the principles which underlie them all. Those principles must control the final disposition of this prosecution.

By the *Act of 1888*, ch. 519, a "State Live Stock Sanitary Board" was created. It consists of three members appointed by the Governor, by and with the advice and consent of the Senate. It is charged with various duties looking to the prevention and the spread of contagious and infectious diseases amongst the live stock within the State. Its powers are exercised for the preservation of the public health. The provision of the statute under which the indictment now before us was framed, reads as follows: "Sec. 19. It shall be the duty of all dairymen or herdsmen or private individuals supplying milk to cities, towns, or villages, to register their herds of cattle with the Live Stock Sanitary Board; in violation of which the parties offending shall be fined not less than one dollar nor more than twenty for each offence." Section 20, and the rules which it formulates, are in these words: "20. It shall be the duty of the Live Stock Sanitary Board to have inspected, at least annually, without notice to the owner or those in charge of any dairy, or the parties supplying milk as named in section 19 of this Article, the premises wherein cows are kept, and if such premises are found in an unsanitary condition the said board may prohibit the sale and shipment of milk from such premises until such time as such premises shall conform to the following sanitary rules:

Rule 1. No building or shed shall be used for stabling cows for dairy purposes which is not well lighted and ventilated, and which is not provided with sufficient feed-troughs or boxes, and suitable floor, laid with proper grades and channels to immediately carry off all drainage; and if a public sewer abuts the premises upon which such building is situated, they shall be connected therewith,

whenever the inspector considers such sewer connection necessary.

Rule 2. No water-closet, privy, cesspool or urinal shall be located within any building or shed used for stabling cows for dairy purposes or for the storage of milk or cream ; nor shall any fowl, hog, sheep or goat be kept in any room used for such purposes.

3. It shall be the duty of each person using any premises for keeping cows for dairy purposes to keep such premises thoroughly clean and in good repairs, and well painted or whitewashed at all times.

4. It shall be the duty of each person using any premises for keeping cows for dairy purposes to cause the building in which cows are kept to be thoroughly cleaned, and to remove all dung from the premises, so as to prevent its accumulation in great quantities.

5. Any person using any premises for keeping cows for dairy purposes shall provide and use a sufficient number of receptacles, made of non-absorbent materials, for the reception, storage and delivery of milk, and shall cause them at all times to be cleaned and purified, and shall cause all milk to be removed without delay from the rooms in which cows are kept.

6. Every person keeping cows for the production of milk for sale shall cause every such cow to be cleaned every day and to be properly fed and watered with abundance of pure clean water.

7. Any enclosure where cows are kept shall be graded and drained, so as to keep the surface reasonably dry ; no garbage, fecal matter or similar matter shall be placed or allowed to remain in such inclosure unless sufficient straw or similar good absorbent material be used to keep the enclosure clean at all times, and no open drains shall be allowed to run through it. And any person who shall ship or sell milk contrary to the aforesaid order of said board, shall be deemed guilty of a misdemeanor, and upon conviction shall be fined not less than one dollar nor more

than twenty dollars for each day during which shipments shall be made after notice of such order."

The indictment charges that the appellee, being a dairy-man engaged in supplying milk to cities, towns and villages within this State, failed, neglected and refused to register his herd of cattle with the Live Stock Sanitary Board. The demurrer admits these averments to be true.

So far as the nineteenth section of the Act is concerned, it is not perceived that, standing alone, it deprives the appellee of due process of law in any way whatever. This is not a proceeding under the twentieth section. The requirement of the nineteenth section would be of little value if it were not followed by, and did not form a part of the other provisions of the statute. The entire Act is strictly a police regulation, enacted for the purpose of preserving the public health. The strides which our knowledge of bacteriology has made in recent years are generally known ; and the ubiquitous microbe has been shown to be a potent agent in the propagation of disease. Tuberculosis, identical it is said with consumption in man, is caused by the organism known as Koch's bacillus, and is readily communicable through milk. Diphtheria is another contagious disease whose specific organism finds in milk favorable conditions of growth ; and there is abundant evidence to show that contaminated milk transmits this contagion. Cholera has again and again been traced to the same source ; and scarlet fever is generally believed to be communicable by infected milk, and it is said that it may be even caused by an eruption on the udder. Typhoid fever bacilli have been detected in milk supposed to be wholesome. Besides conveying disease, milk occasionally contains certain germs which form poisonous products known as ptomaines. Milk may carry the bacilli of these and perhaps other deadly diseases to infancy, to adolescence and to age ; to the delicate and to the robust alike, and to persons in every class and condition of society. It may receive these germs direct from the cow, if the cow be unhealthy ; or it may

absorb them from the dairy, the dairy utensils or the stable, if these be uncleanly. Thorough inspections of cattle and dairies may reduce the frequency of infection. The preservation of the public health by preventing the sale of infected milk, or of milk that may come from infected sources, when milk by reason of its almost universal use in one form or another as an article of food is especially likely to spread disease, is one of the most imperative duties of the State, and obviously one most incontestably within the scope of the police power. As a means to that end—the preservation of the public health—a requirement that every person selling milk for consumption in cities, towns and villages shall cause his herd of cattle to be registered with the Live Stock Sanitary Board, is a reasonable and an appropriate enactment ; and the subsequent provisions are necessary parts of the scheme. The *19th Sec.* no more deprives the individual of due process of law than did the ordinance in *Easton* v. *Covey*, 74 Md. 262, which prohibited the erection of any building without a permit from the commissioners of the town ; or an ordinance forbidding the keeping of swine without a permit in writing from the board of health ; *Quincy* v. *Kennard*, 151 Mass. 262 ; or an ordinance requiring the written permission of the Mayor of a town before any person was allowed to move a building along the streets ; *Wilson* v. *Eureka City*, 173 U. S 32 (decided February 20th, 1899) ; or the ordinance requiring a license for the removal of the contents of privies and subjecting the holders of such license to the orders of the Board of Health. *Boehm* v. *Mayor, &c., Balto.*, 61 Md. 259. The constitutional limitations which declare that no person shall be deprived of his property or liberty without due process of law, have never been construed as being " incompatible with the principle—equally vital, because essential to the peace and safety of society—that all property in this country is held under the implied obligation that the owner's use of it shall not be injurious to the community. * * * * * * The exercise of the police power by the destruction of property

which is itself a public nuisance, or the prohibition of its use in a particular way, whereby its value becomes depreciated, is very different from taking property for public use, or from depriving a person of his property without due process of law." *Mugler* v. *Kansas*, 123 U. S. 623.

It was earnestly insisted that the *Act of 1898* deprives the appellee of the equal protection of the law guaranteed by the XIV Amendment. This amendment was called to the attention of the Supreme Court for the first time in eighteen hundred and seventy-two, in the *Slaughter-House cases*, 83 U. S. 36; and since then it has been repeatedly considered and interpreted. The scope of the amendment, in so far as it relates to the branch of the subject now under discussion, has been briefly but clearly stated by the late JUDGE COOLEY: "The guaranty of equal protection is not to be understood, however, as requiring that every person in the land shall possess the same rights and privileges as every other person. The amendment contemplates classes of persons and the protection given by the law is to be deemed equal if all persons in the same class are treated alike under like circumstances and conditions, both as to privileges conferred and liabilities imposed. The classification must be based on reasonable grounds; it cannot be a mere arbitrary selection." *Cooley's Princ. Con. L.* 249. This is abundantly supported by the adjudged cases. *Hays* v. *Missouri*, 120 U. S. 68; *Mo. P. R. Co.* v. *Mackey*, 127 U. S. 205; *Walston* v. *Nevin*, 128 U. S. 578; *Bell's Gap R. Co.* v. *Pennsylvania*, 134 U. S. 232; *Pac. Exp. Co.* v. *Seibert*, 142 U. S. 339: *Giozza* v. *Tiernan*, 148 U. S. 657; *Col. S. R. Co.* v. *Wright*, 151 U. S. 470; *Marchant* v. *Penna. R. Co.*, 153 U. S. 380; *St. Louis, &c., R. Co.* v. *Mathews*, 165 U. S. 1. Thus in *Hays* v. *Mo.*, *supra*, it was held, that a statute of a State which provided, that in capital cases, in cities having a population of over one hundred thousand inhabitants, the State shall be allowed fifteen peremptory challenges to jurors, whilst elsewhere in the same State the prosecution was only allowed eight such challenges,

did not deny to a person tried for murder in, a city contain-
ing over one hundred thousand inhabitants, the equal pro-
tection of the laws enjoined by the XIV Amendment, and
that there was no error in refusing to restrict the State's
peremptory challenges to eight.   And so in the very recent
case of *Central Loan and Trust Co.* v. *Campbell Commis-
sion Co.* (decided by the Supreme Court on February 20,
1899), 173 U. S. 84; it was held that a statute permitting
an attachment against a non-resident debtor without a bond,
whilst requiring a bond for an attachment against a resident
debtor, does not constitute a denial to the non-resident of
the equal protection of the laws, because it was within the
power of the Legislature to divide debtors into two classes
—non-resident and resident—and when so classified to
prescribe different methods of proceeding against them.
The classification, which the Legislature is authorized to
make, may relate to territorial divisions of a State.   Thus,
in *Mo.* v. *Lewis*, 101 U. S. 22, it was said by Mr. Justice
Bradley: " We might go still further, and say, with un-
doubted truth, that there is nothing in the Constitution to
prevent any State from adopting any system of laws or judi-
cature it sees fit for all or any part of its territory.   If the
State of New York, for example, should see fit to adopt the
civil law, and its method of procedure, for New York City
and the surrounding counties, and the common law, and its
methods of procedure, for the rest of the State, there is
nothing in the Constitution of the United States to pre-
vent its doing so.   This would not, of itself, within the
meaning of the XIV Amendment, be a denial to any
person of the equal protection of the laws."   The clas-
sification may have reference to occupations.  *Holden*
v. *Hardy*, 169 U. S. 366, where it was held that a
State statute limiting the period of employment of work-
men in underground mines, or in the smelting, reduc-
tion or refining of ores or metals, to eight hours per day,
and making its violation a misdemeanor, was a valid exer-
cise of the police power of the State.   Or, again, the

classification may relate to individuals. *St. Louis Ry.* v.
*Mathews*, 165 U. S. 1. But in every instance the classifi-
cation, to be valid, must be based on reasonable grounds.
It must not depend on distinctions which do not furnish any
proper basis for the attempted classification. "That," as
declared by the Supreme Court in *Gulf. C. & S. F. R. Co.* v.
*Ellis*, 165 U. S. 150, "must always rest upon some differ-
ence which bears a reasonable and just relation to the act,
in respect to which the classification is proposed, and can
never be made arbitrarily and without any such basis." In
the case just cited, a statute of Texas imposing an attorney's
fee in addition to costs upon railway companies omitting to
pay certain claims within a certain time, which applied to no
other corporations or individuals, was declared unconstitu-
tional as denying to railway companies the equal protection
of the laws. In the course of the Court's opinion, MR.
JUSTICE BREWER said : " It is, of course, proper, that every
debtor should pay his debts, and there might be no impro-
priety in giving to every successful suitor attorney's fees.
Such a provision would bear a reasonable relation to the
delinquency of the debtor, and would certainly create no
inequality of right or protection. But before a distinction
can be made between debtors and one be punished for a
failure to pay his debts, while another is permitted to be-
come in like manner delinquent without any punishment,
there must be some difference in the obligation to pay, some
reason why the duty of payment is more imperative in the
one instance than in the other." " It is," said the same
Court in a very recent case, "the essence of a classification
that upon the class are cast duties and burdens different
from those resting upon the general public." " Indeed, the
very idea of classification is that of inequality, so that it
goes without saying that the fact of inequality in no manner
determines the matter of constitutionality." "While cases
on either side and far away from the dividing line are easy
of disposition, the difficulty arises as the statute in question
comes near the line of separation." *Atchison T. & S. F.*

*R.* v. *Mathews*, 174 U. S. 96 (decided April 17th, 1899).
Special burdens are often necessary for general benefits,
particularly in respect to the preservation of the public
health. " Regulations for these purposes may press with
more or less weight upon one than upon another, but they are
designed, not to impose unequal or unnecessary restrictions,
upon any one, but to promote, with as little inconvenience
as possible, the general good. Though in many respects
necessarily special in their character, they do not furnish
just ground of complaint, if they operate alike upon all
persons and property under the same circumstances and
conditions." *Barbier* v. *Connolly*, 113 U. S. 31.

If the Legislature of Maryland has, by the statute under
consideration, made a class to which the provisions of the
Act were designed to apply ; and if that classification is just
and reasonable and not purely arbitrary, the ruling on the
demurrer was wrong. The ultimate object of the statute
was, as we have seen, to protect the health of persons liv-
ing in cities, towns and villages, from the disease to which
impure or contaminated milk might expose them. There
is a definite and well-ascertained class of persons described
in the statute, and that class comprises dairymen, herdsmen
and other individuals who supply milk to cities, towns and
villages. It was not the purpose of the Act to include
within its purview all persons who sell milk; but it put into
a class all dairymen, herdsmen and individuals who supply
milk to cities, towns and villages—those who are engaged
in the business of selling milk in populous communities.
These persons are singled out from all others who may
own cows, or who may occasionally sell milk in the country
to some individual, and are grouped into a class, because
they are the persons whose carelessness, whose inattention
to their herds, or whose uncleanly surroundings may origi-
nate or promote the spread of disease in populous localities.
No dairyman, herdsman or individual who supplies milk to
cities, towns or villages is exempted from the operation of
the law, but all who are thus engaged are specifically in-

cluded. There is no uncertainty as to the persons compos-
ing the class, and no dispute that the General Assembly in-
tended to make exactly that classification.

Is the classification just and reasonable, and free from
the imputation of being merely arbitrary ? The act, in re-
spect to which the classification is proposed, is the act of
supplying milk to cities, towns and villages by dairymen,
herdsmen and other individuals. It is founded on the right
of the State, in the exercise of its police power, to classify
occupations with relation to their peculiar liability to cause
injury to the inhabitants of the designated places, from the
article of food employed in the business. It is identical in
principle with the classification under a Utah statute, by
which a conclusive presumption of negligence was made to
apply to persons driving a herd of cattle over a public high-
way, whilst the same presumption did not apply to a person
driving less than a herd. *Jones* v. *Brim*, 165 U. S. 180.
There is an obvious difference between the occasional sale
of milk to an isolated individual and the habitual sale of it
to the inhabitants of a city, a town or a village ; and this dif-
ference is manifestly sufficient to " furnish a reasonable
basis for separate laws and regulations." *State* v. *Loomis*,
115 Mo. 307. The clear purpose of the Legislature was
to guard against impurities in milk furnished to residents
in populous settlements, by requiring persons who supply
milk to cities, towns and villages, to keep their cows and
premises in a sanitary condition. The danger arising from
the non-observance of the sanitary rules prescribed by the
Act is increased in proportion to the increased number of
the consumers of milk ; and a contagious disease introduced
by contaminated milk in a thickly-settled locality is vastly
more serious, because vastly farther reaching, than it can
possibly be when communicated, by the same means, to an
isolated individual. The duty to avoid the introduction of
disease, in both cases, is unquestionably incumbent on the
vendor of milk, but there is every reason why a breach of

that duty will be far more injurious in the one than in the other instance.

Though the statute furnishes no protection to persons not living in cities, towns or villages, this in no way indicates that its classification is unreasonable, or that it deprives any one of the equal protection of the laws in the sense that would annul it. *Hays* v. *Missouri, supra.* It was designed, like many other health laws, to operate in a restricted territory. There are numerous health laws which do not operate on persons living beyond the limits within which they are applicable; but it by no means follows that they are void merely because they were not made to cover a wider range of country; because a classification may be made with reference to the subdivisions of a State. *Missouri* v. *Lewis, supra.* It would not have been practicable to have made the statute broad enough to include every vendor of milk, whether he sold to cities, towns and villages, or only to a single individual; nor was it necessary, in order to reach the evil aimed at, that this should have been done. Laws relating to the inspection of milk do not operate outside of the large cities, and yet it has never been held that they are invalid on that account. The Act creates a reasonable class and bears upon all in that class alike; and it cannot be assailed because it may not, perhaps, be efficacious enough to wholly eradicate the evil it was framed to extirpate. Such a test of its constitutionality would make the validity of a measure depend upon the universality of its application and not upon the fact that the classification was just and reasonable, and was made with reference to some difference which bore a proper relation to the act in respect to which the classification was proposed.

The twentieth section of the Act does in a measure interfere with property rights, but not to such an extent or in such a way as to impair the validity of the enactment. Whilst it is undoubtedly true that the police power cannot be put forward as an excuse for oppressive and unjust legislation, it may, most certainly, be resorted to for the pur-

pose of preserving the public health, safety or morals, or the abatement of public nuisances ; and a large discretion " is necessarily vested in the Legislature to determine, not only what the interests of the public require, but what measures are necessary for the protection of such interests." *Lawton* v. *Steele*, 152 U. S. 133. As observed by CHIEF JUSTICE SHAW, in *Commonwealth* v. *Alger*, 7 Cush. 84, " Every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it may be so regulated that it shall not be injurious to the equal enjoyment of others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. * * * * Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as will prevent them from being injurious, and to such reasonable restraints and regulations established by law, as the Legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient." " This power, legitimately exercised, can neither be limited by contract nor bartered away by legislation." *Holden* v. *Hardy, supra.*

The requirements of the twentieth section of the Act of 1898 are simply such regulations as the General Assembly had, in the exercise of the police power, the undoubted authority to prescribe. A dairyman has no right to sell milk that may be contaminated, or that may be given by diseased cows, or may be kept on uncleanly premises, or in unsterilized utensils; and if he undertakes to sell milk at all to cities, towns and villages, he must submit to such reasonable sanitary regulations respecting his property used in that business, as the Legislature may deem necessary to prevent that property from being the source or origin of infectious and contagious diseases. No matter how absolute his title, he holds his property subject to this liability, that his use of it may be so regulated as that it shall not be injurious to the community. The statute does not de-

prive him of his property; but it does impose upon him the duty of so using it, when employed in that business, that no injury shall result to others, most likely to be affected by a disregard on his part of the reasonable health regulations which it enacts. Almost every police regulation affects, to a greater or less extent, some property right; but there is no such invasion of a property right by this Act as other valid statutes have permitted. For example : In the *Slaughter-House cases,* 83 U. S. 86, a law of the State of Louisiana, vesting in a slaughter-house company the sole and exclusive privilege of, conducting a live-stock landing and slaughter-house business, and requiring that all animals should be landed at the stock-landings and slaughtered at the slaughter-houses owned by the company and nowhere else, was upheld as a valid exercise of police power, though it rendered practically valueless other property that had previously been used by its owners for slaughter-houses. See too, *Northwestern Fert. Co.* v. *Hyde Park,* 97 U. S. 650; *Parker and Worthington on Pub. Health and Safety,* sec. 251.

For the reasons we have given, we are perfectly satisfied the Act of 1898 is a valid exercise of the police power, and that it is entirely free from constitutional objections. There was consequently error in the ruling which sustained the demurrer. The judgment appealed from will, accordingly, be reversed, and the case will be remanded for a new trial.

> *Judgment reversed and new trial awarded; costs above and below to be paid by the appellee.*

(Decided June 22nd, 1899).