# SUPERIOR COURT OF BALTIMORE CITY.

Filed June 6, 1928.

### JOHN H. CLENDANIEL
### VS.
SAMUEL M. SHOEMAKER AND OTHERS, CONSTITUTING THE STATE BOARD OF AGRICULTURE OF THE STATE OF MARYLAND.

*Clarence W. Perkins* for plaintiff.
*Philip B. Perlman* for defendant.

FRANK, J.—

The petition in this case prays for a writ of mandamus against the State Board of Agriculture of Maryland, commanding it to nominate and appoint an independent appraiser to act on its behalf, in conjunction with an appraiser already appointed by the petitioner in making an appraisement of thirty-one bovine animals, the property of the petitioner, alleged to have been condemned, as set out in the petition.

The petition recites, among other things, that on March 14, 1928, petitioner's herd was tested for tuberculosis by the State Board; that on March 17, 1928, the State Board condemned the cattle as being infected with tuberculosis; that the petitioner on the latter date notified the State Board that he had appointed an appraiser to act on his behalf in conjunction with an appraiser to be nominated by the State Board, but that the State Board has refused, and still does refuse, to make such nomination.

The special defense. set up by the respondents is that, while the Board has quarantined the cattle of the petitioner as being infected with tuberculosis, it has not yet deemed it necessary to cause the said cattle to be slaughtered and has not so ordered and that, therefore, the respondents are not under any duty to have the said cattle appraised or to make any payment therefor to the petitioner.

At the hearing before the Court without a jury a considerable mass of testimony was taken, and the arguments to the Court covered a wide range. The evidence shows that the petitioner's cattle were tested by the duly authorized agent of the respondent and of the Federal Bureau of Animal Industry, who found that they were infected with bovine tuberculosis, and ordered them to be quarantined. Although the notice of quarantine contained upon it an estimate of value of each of the cattle therein designated, it is agreed by all parties that this amounts merely to a preliminary estimate of value made by the field officer of respondent, has no binding effect upon any one and does not constitute an appraisal within the meaning of the Maryland statutes hereinafter referred to. Upon the face of the notice of quarantine there also appears a stamp "Consign to Dr. D. R. Hoffman, Union Stock Yards, Baltimore, Maryland." The testimony clearly shows that this was not intended and was not understood as a binding direction so to ship the cattle, but was placed upon the notice merely as a guide to the petitioner, in the event that the agreement as to the disposition of the cattle hereinafter set out should be entered into. The notice in question is entitled "Tuberculosis quarantine notice," and states that the therein described herd of cattle "are hereby quarantined apart from all other cattle

at the owner's expense'" and then proceeds "you are hereby forbidden to move or allow to be moved from the above described premises or portion of premises any or all of these cattle, except upon a written permit issued by this office. This quarantine shall remain effective until cancelled by written official notice."

Subsequently, upon a form of the United States Department of Agriculture, Bureau of Animal Industry, the list of cattle set out upon the quarantine notice with the appraisal thereon was sent to the petitioner by E. B. Simonds, who described himself as, and the testimony disclosed was, an agent both of the Federal Bureau and of the Maryland State Board of Agriculture. Upon these forms the petitioner was invited to accept the amount set forth thereon for the respective heads of cattle. This he refused to do, and insisted upon an appraisal being forthwith made under the provisions of the Maryland statutes and, upon the failure of the State Board to proceed with such appraisement, the petitioner filed his petition for a writ of mandamus as above recited.

The testimony discloses that the proceeding, by which Mr. Clendaniel, the petitioner, was asked to sign an agreement accepting the appraisement as made at the time of the issuance of the notice of quarantine is a long established practice, and one in which the petitioner himself has participated on previous occasions; that the effect of this arrangement, however, is to bring about a purely voluntary agreement for the slaughter of the cattle, entirely independent of the provisions of the Maryland statutes; that under this arrangement the State of Maryland has been able to avail itself of the plan devised by Congress and the Federal authorities for the eradication of bovine tuberculosis, the finanacial end of which operates as follows: When by agreement between the cattle owner and the State and Federal authorities it is voluntarily agreed that the cattle shall be slaughtered, all pure bred cattle are treated as having a maximum value of $150 and all grade cattle as having a maximum value of $75. After slaughter of the cattle the carcass is sold for what it will bring, the net amount of such sale is paid to the owner. Such net proceeds are deducted

from the amount of the appraisement— the maximum of $150 in the case of pure bred and $75 in the case of grade cattle as above stated—and the balance is divided into three parts—one-third thereof is paid by the United States Government to the cattle owner, one-third by the State of Maryland to the cattle owner and the remaining one-third absorbed by the cattle owner as his loss. This, the testimony shows, represents the only terms upon which the United States Government is willing to co-operate in the eradication of bovine tuberculosis and contribute to the reimbursement of the cattle owner. (Regulation 3 — Co-operative Agreements—United States Department of Agriculture, Bureau of Animal Industry.) The State of Maryland naturally has been anxious to get the benefit of this arrangement, and the testimony shows the State Board of Agriculture has never, since this plan has been in effect, ordered any cattle, infected with tuberculosis, to be slaughtered, except in accordance with the provisions thereof. It will be remembered that this plan can be put into effect only by virtue of the voluntary agreement entered into by the cattle owner as above described. The State Board of Agriculture is expressly authorized to enter into such an agreement with the Federal authorities by the terms of Section 20 of Article 58 of the Annotated Code.

I.

The petitioner, however, insists that he is entitled at this time to have an appraisement made pursuant to the provisions of Section 19 of Article 58. Whether or not his contention is sound depends upon the correct construction of this and other pertinent Sections of that Article. In order to obtain a suitable background for a discussion of the true meaning of these statutes, it is desirable to determine the extent of the constitutional authority of the State in dealing with animals suffering from tuberculosis. The Maryland statute deals with two phases of regulation: (a) Quarantine of diseased animals; (b) their slaughter. (a) Under the police power, the State governments may pass quarantine laws for the purpose of isolating diseased or suspected cattle, and thus preventing their communicating disease to other cattle with which they may come in contact.

Deems vs. Mayor and City Council of Balto., 80 Md. 164, at p. 175; Broadbelt vs. State, 89 Md. 565, 578, &c.; 3 C. J. 51, Sec. 148.

(b) Likewise, under the police power the States may confer authority upon designated officers or specially created commissions to destroy animals afflicted with a contagious or infectious disease. Such statutes are held to be valid, even though no provision is made for compensation to the owner.

3 C. J. 54, Sec. 151; Note 18 L. R. A. (N. S.) 369; Note 8 A. L. R. 70, Sec. b.

In Deems vs. Mayor and City Council of Baltimore, supra, the Board of Health of the city was held to have full power under a city ordinance to destroy condemned milk, without any provision for compensation to the owner. The exercise of such power was held to be "fully sustained both on principal and authority." The force and effect of this case, decided in 1894, have never been questioned. It has been repeatedly cited and approved.

## II.

The Maryland statutes must next be examined in order to determine when and under what circumstances the State has consented to waive its immunity from liability to compensate the owners in dealing with cattle afflicted with tuberculosis. Section 19 of Article 58 provides that: "In the event of its being *deemed necessary* to prevent the spread of contagious or infectious disease, to cause any animal or animals so diseased, or exposed to such disease, *to be slaughtered*, the value of such animal or animals shall be appraised under such rules and regulations as may be prescribed by the State Board of Agriculture, by two sworn appraisers * * * one of which appraisers to be appointed by the owner or custodian of such animals, the other by the said Board of Agriculture or its duly authorized representative * * *; but in no event shall the appraisement, together with the estimated value of the carcass, hide and offal exceed ninety per centum of the fair market value of the animal or animals or a total of five hundred dollars for any one animal; and which said appraisement when approved by said Board of Agriculture shall be filed with the Comptroller and the Comptroller shall forthwith issue his warrant to the Treasurer for the amount of said appraisement, in favor of said owner or owners." The right of appeal to designated Courts is given to any owner dissatisfied with such appraisement. (Acts of 1916, Ch. 337). It is to require the Board of Agriculture to appoint the appraiser provided for in this Section that the present proceeding is directed.

Chief Judge Parke had this Section, as well as Section 15, under consideration in the case of Ramsburg vs. State Board of Agriculture in the Circuit Court for Carroll County, decided on January 14th, 1928. The petition for mandamus in that case recited that an appraisal of $150 had been made and prayed that the Board of Agriculture either approve that appraisement as made or show cause why such approval should not be given. Judge Parke said: "The duty on the part of the State Board of Agriculture to act on the appraisement was ministerial in the sense that it had to be performed. It was discretionary to the extent that it involved the judgment of the Board as to whether or not it should be approved. So, when this paper was filed in Court, undoubtedly, the State Board of Agriculture was in default in not acting on the appraisal of this animal. And, if at that time or, if at the present time, the same situation had continued, the Court would undoubtedly issue the mandamus applied for to compel the State Board of Agriculture to perform that ministerial act, but would not in any way seek to control the exercise of its judgment in the discharge of the duty which the law imposes upon it." Judge Parke then goes on to point out what must be done under the statute when "an animal is to be slaughtered by reason of its condition," and stresses the necessity of following the requirements of Section 19 as to appraisement. He nowhere decides, as he was not called upon to consider, the duty of the Board with respect to the slaughter of diseased animals. In the case before him it was a concessum that an appraisal had been made which required only the approval or disapproval of the Board. He further held that if cattle were to be slaughtered, an appraisal must be had. In these views I fully concur. The questions involved in the present proceeding were not before him and, of course, were not passed upon.

Section 19 prescribes the appraisement only "in the event of *its being*

728

*deemed necessary for the said Board* to prevent the spread of contagious or infectious disease, *to cause any animal or animals so diseased, or exposed to such disease to be slaughtered * * *￼* (Italics supplied.)

By Section 15 (also Sec. 337, Act 1916), it is prescribed that "all appraisements of animals to be slaughtered * * * shall be approved by said Board before such animals are so slaughtered * * * *and said Board shall have the discretion to have such animals slaughtered or quarantined.*" (Italics supplied.)

These Sections clearly give the Board discretion to determine whether diseased animals should be slaughtered or quarantined and then provide that an appraisement shall be had only, when the Board deems it necessary to cause such animals to be slaughtered. That such discretion is reposed in the Board is rendered still plainer, if possible, by the provisions of the later Act of 1924, Chapter 202, Section 5-A, codified as Section 6 of Article 58. This Section reads as follows: "For the protection of public health and to prevent the infection of live stock of the State with contagious diseases, the State Board of Agriculture through Federal licensed inspectors is hereby empowered to enter upon any premises at any time and *test for tuberculosis* or other contagious diseases by any method any animals found thereon; and should any such animal be found to be infected with *tuberculosis* or other contagious disease, *the Board shall have power to quarantine such animal and such premises and such other animals as it or he may think necessary to prevent the spread of the disease. The State Board of Agriculture through its authorized agents is empowered to require the slaughter of any animals found to be infected with tuberculosis or other contagious disease,* under such regulations as the State Board of Agriculture may from time to time issue under the powers granted in Sections 6 to 9 for the control of such contagious diseases." (Italics supplied.)

It is thus made discretionary with the Board to do either of two things (1) to quarantine, (2) to require the slaughter of, animals found to be infected with tuberculosis. Each grant is separate and distinct from the other. Each may be exercised jointly with or to the exclusion of the other. Animals may be quarantined without reference to their slaughter. Animals may be slaughtered, although they may never have been quarantined. This discretion of an important State Board may not be controlled by the Courts unless the Board fails in a proper case to exercise it or in exercising it does so fraudulently, illegally or arbitrarily. For this proposition of law, so firmly established, no citation of authority is needed or desirable.

The quarantining of petitioner's cattle need not be followed by their slaughter, if in the Board's discretion, exercised in good faith, such slaughter is not necessary or proper for the protection of public health and to prevent the infection of the live stock of the State. If the quarantining of the cattle is, in the judgment of the Board, adequate for this purpose, then their slaughter need not follow even though the failure to order the slaughter may result in hardship or loss to the petitioner. This is the plain meaning of the Sections of the Code above set out.

It is equally clear that no appraisement shall be had unless and until the Board of Agriculture deems it necessary to cause the diseased animals to be slaughtered. The exercise by the Board of its discretion to slaughter the animals is thus a condition precedent to the right to an appraisement. The Board has declined to direct such killing. Unless it may be required so to do, this Court has no right to require the Board to join in an appraisement. This conclusion would seem to be inescapable from the express language of the statute. What authority I have been able to find seems to require the same result. In State of Indiana, ex rel. Alexander, vs. Coover, State Veterinarian, 179 Ind. 477 (May 6, 1913), an action had been begun by the appellant against the appellee, asking that a mandamus issue commanding the appellee, State Veterinarian, to appoint an appraiser, who with another appointed by relator, may appoint another appraiser, the three appraisers to appraise a certain cow which had been condemned by the appellee on account of its being infected by tuberculosis. The allegations of the petition were substantially the same as those in the petition, and shown as facts by the evidence, in the case now under consideration. The cow was ordered to be quarantined. Relator alleged that the ap-

729

pellee had deemed it necessary to protect the health of the public by the slaughter of the said cow so infected with tuberculosis, that he had made demand on the appellee to take proceedings to compensate him for the cow, that no agreement could be reached as to its value; that he had demanded the appointment of an appraiser by the appellee so that an appointment could be made under the provisions of the statute, but that appellee had refused so to do. The case was heard on demurrer to the petition.

The opinion recites the provisions of the Indiana statute, which are strikingly like those of the Maryland law, and then goes on to say: "There is no allegation in appellant's petition in this case that the said animal had been ordered killed by the State Veterinarian. The order made by the State Veterinarian * * * after describing the animal, says, "That she is to be kept isolated from all other cattle and swine in quarters now located until destroyed under Federal supervision, not to be used except as provided by law.' This order of the veterinarian * * * counteracts the averment that she was ordered killed and conclusively shows that she was not ordered killed, but to be simply quarantined. * * * Under the law as it must be construed and under the terms of which the duties of veterinarians are very clearly defined, the relator would have no right to insist upon the appraisement of the animal until she was ordered killed by the veterinarian."

### III.

Only one other question remains to be considered. Is the refusal of the Board of Agriculture to order petitioner's cattle to be slaughtered, under the evidence, such an unreasonable and arbitrary action as to entitle the Court to override its decision and by writ of mandamus to require it to appoint an appraiser as prayed, although said cattle have never been ordered to be killed? Petitioner brands as arbitrary the attitude of the State Board in refusing to order the cattle to be slaughtered, unless the petitioner enter into the voluntary agreement described in the early part of this opinion. By this agreement, it will be recalled, he would accept a valuation of $150 for each of his pure bred cattle and of $75 for each of his grade cattle, and would be paid the actual proceeds of the sale of

each of the carcasses, would receive one-third of the difference between the above valuation of each animal and said proceeds from the United States, one-third thereof from the State of Maryland and would himself bear the remaining one-third thereof. Petitioner claims that this is a purely arbitrary stand on the part of the State Board, without reason or justification in law: that this Court, therefore, should override the decision of the Board, treat the case as though slaughter had been directed and require an appraisement.

The testimony in the case abundantly establishes that the quarantining of the petitioner's cattle adequately protects the health of the State and protects from infecion the live stock of the State, and that slaughter is not necessary for that purpose. In this respect, the discretion of the Board not to order the killing of the animals was fairly and wisely exercised. The insistence by the Board on the making of the agreement whereby its financial responsibility to petitioner is limited to one-third of the difference between the valuation of each kind of cattle and the proceeds of the sale of the carcass, as a preliminary to slaughter, therefore, alone may be subject to the stigma of arbitrariness. If slaughter be ordered, the petitioner becomes entitled to appraisement and the other rights under Section 19 of Article 58.

Without reviewing in detail the voluminous evidence on this point, it conclusively appears that, unless carefully handled, the entire State appropriation to the Board of Agriculture would be grossly inadequate for its purposes; that, if but a small proportion of the tuberculosis cattle in the State were to be ordered to be slaughtered, the funds available to pay indemnities to owners under the provisions of Section 19 would enable but a very small portion of the owners to be paid. The Board, from every financial necessity, would be justified in using quarantine only without any indemnity where that is safe and ordering killing only where that is necessary and the owner enters into the agreement for limited indemnity under the Federal agreement made pursuant to Section 20. This plan of operation has worked most satisfactorily to the State, has greatly reduced the prevalence of bovine tuberculosis and has enabled the State Board in recent years to carry on its important

work within the amounts of money that the General Assembly has been willing to appropriate for this purpose. Prior to the exclusive use of this plan, the Board had greatly exceeded its appropriations, and had incurred a large deficit. This situation was declared by Governor Ritchie to be in violation of the budget provision of the Constitution and drastic steps were taken by him to prevent its recurrence. The twofold duty thus devolves upon the State Board to protect the health of the State and, at the same time, to limit its expenditures to the appropriations made by the General Assembly. Can it be said that in its efforts to do so it has abused the discretion which the law confers upon it? If the petitioner is entitled to appraisement and compensation under Section 19 of Article 58, so is every other owner of cattle which have been quarantined because found to be tuberculous. In such a situation, the evidence conclusively demonstrates that appropriations will be required many times greater than those now available, and there can be no assurance that they will be provided.

I am not unmindful of the hardship imposed upon the petitioner by the quarantining of his cattle. He has been treated in the same way as every other cattle owner in the same situation is now being treated. In the Ramsburg case above cited, the cattle owner was given the same basis of valuation as is now offered to the petitioner. The latter can at any time receive the valuation of $150 and $75, respectively, for pure breed and grade cows by indicating his willingness to accept them. Moreover, it appears that his cows in quarantine have some availability. Within limits they may be used for breeding purposes. Their milk, if properly pasteurized, has a restricted market and the same thing is true of pasteurizing butter made from the milk. That he suffers a loss cannot be doubted. This loss may be reimbursed, if at all, only according to the provisions of law. As stated by Chief Judge Robinson at page 174 of Deems vs. Baltimore, supra, "Whatever injury or inconvenience he may suffer * * * he is, in the eye of the law, compensated by sharing the common benefit resulting from the summary exercise of this power, and which under the circumstances, was absolutely necessary for the protection of the public."

I am unable to find that the State Board of Agriculture has abused the discretion reposed in it by law. The prayer for the writ of mandamus will be refused and the petition dismissed.