## STEPHENS et al. v. CITY OF OKLAHOMA CITY et al.

No. 20175. Opinion Filed July 7, 1931.

P. E. Gumm, for plaintiffs in error.

M. W. McKenzie, Mun. Counselor, and A. L. Hull, Asst. Mun. Counselor, for defendants in error.

ANDREWS, J. The plaintiffs in error, hereinafter referred to as plaintiffs, instituted a suit in the district court of Oklahoma county against the defendants in error, hereinafter referred to as defendants, to enjoin them from enforcing the provisions of Ordinance No. 3391 adopted by the defendant city. At the conclusion of the evidence of the plaintiffs, the trial court sustained a demurrer thereto filed by the defendants, and rendered judgment in favor of the defendants. From that judgment an appeal was taken to this court.

The record shows that the plaintiffs are residents of Oklahoma City and engaged in the milk and dairy business, and the sale and distribution of raw milk to consumers in the city of Oklahoma City. The city adopted the ordinance in question, and is attempting to enforce the provisions thereof. The plaintiffs have not paid or offered to pay the license fee provided by the ordinance, and brought this action to determine whether or not they should be compelled to pay such fee.

The plaintiffs contend that the ordinance is invalid for the reason that the fees therein provided to be charged are unreasonable, arbitrary, unjust, and discriminatory, in that the fees therein provided to be charged persons operating inspected dairies are not uniform and equal with those to be charged persons operating pasteurizing plants and farm dairies, and that there is no such reasonable difference in the situation and circumstances as to suggest the practical necessity of making such a distinction in the amount of license fees therein provided to be charged.

It is agreed that the ordinance is a regulatory one and not for the purpose of raising revenue, and that the license fees charged may not exceed the expense of issuing the license and regulating the business. Mitchell v. City of Lawton, 124 Okla. 60, 253 Pac. 999.

We are thus presented with three questions: First, is the legislative body authorized to classify the milk industry into three classes, to wit, farm dairies, inspected dairies, and pasteurizing plants? Second, are the fees provided to be charged operators of inspected dairies in excess of the expense of issuing the license and regulating that business? And third, is there an unreasonable, arbitrary, and unjust discrimination between the amount of fees provided to be charged operators of inspected dairies and the amount of fees provided to be charged operators of pasteurizing plants or farm dairies?

The plaintiffs assume that the legislation is intended to stamp out the sale, delivery, and consumption of raw milk through the imposition of excessive license fees upon inspected dairies, thereby preferring those operating pasteurizing plants and those engaged in the sale of milk to pasteurizing plants. This court cannot assume any such legislative intent, and there is no evidence in the record to support that theory. The ordinance appears from the record to have been enacted within the legislative authority of the municipality. Such an ordinance is presumed to be valid, and, in the absence of evidence of invalidity, it is the duty of this court to hold it valid.

It is contended that the inspected dairies, pasteurizing plants, and farm dairies are in the same class in that they are all engaged in the milk industry. Be that as it may, the record shows a necessity for classification, and we think the classification made is shown by the record to be reasonable. The expense of issuing the licenses provided for by the ordinance is shown not to be the same for inspected dairies as it is for pasteurizing plants or farm dairies. The work incident to inspection and regulation of inspected dairies is shown to be in excess of that required for farm dairies. This court cannot say from the record in this case that the legislative body was not

justified in classifying the milk industry into classes consisting of inspected dairies, pasteurizing plants, and farm dairies.

No question is presented as to lack of uniformity within the classes designated, and the record shows that there is no discrimination therein.

There is nothing in the record to show that the fee provided to be charged for the operation of inspected dairies is in excess of the expense of issuing the license and regulating the business. These fees vary from $10 to $30 per year, according to the number of cows in the herd. The record shows that an inspection of those dairies is made before a license is issued; that the dairies are scattered over a portion of Oklahoma, extending from McLoud to El Reno, and from the Kansas line to Pauls Valley; that the dairies are scored for cleanliness and protection after careful investigation of the herd, barns, milking arrangements, facilities for cooling, storing and transporting milk, and otherwise; that monthly inspections are made after license is issued, and in warm weather semi-monthly inspections are made; that officers are employed and paid to perform the services incident to the inspection and regulation; that the total cost thereof to the city is an amount in excess of the total revenue from the licenses provided for by the ordinance; and that it is necessary for the public health and safety that there be both an inspection and regulation of dairies furnishing raw milk for sale to and consumption by the people of the defendant city. This court is unable to say from the evidence that the maximum fee charged is in excess of the expense of the issuance of license and regulation of the business, and the record shows that the cost thereof is considerably in excess of the amounts charged.

The principal contention of the plaintiffs is that there is an unreasonable, arbitrary, and unjust discrimination between the amount of fees provided to be charged operators of inspected dairies and the amount of fees provided to be charged operators of pasteurizing plants and farm dairies. The plaintiffs contend that the approximate amount of fees proposed to be charged inspected dairies is $2,110, that of farm dairies $500, and that of pasteurizing plants $450, and that inspected dairies are charged more than twice as much in fees as farm dairies and pasteurizing plants combined. The plaintiffs contend that it takes more work and costs the city more for inspection and regulation of farm dairies and pasteurizing plants than for inspected dairies. They contend that 60 per cent. of the milk business is controlled by the pasteurizing plants, which receive and distribute the milk from the farm dairies, and that less than half of the amount of fees are collected from them as are collected from the inspected dairies.

The record shows that milk from what is denominated in the ordinance as "farm dairies," is not sold in the raw state to consumers, but is delivered to pasteurizing plants for treatment prior to sale to consumers.

The public health regulations and the authorities on public health agree that the process of pasteurization is such as to kill bacteria existing in milk. Milk is a food of general use; it is sensitive and easily contaminated, and bacteria develops therein rapidly. Milk is affected not only by the animal from which it comes, but by the persons handling the same and the conditions under which it is handled. That the consuming public may be protected by the public health officials of a municipality, it is necessary that there be inspection and regulation, not only of the cattle from which the milk comes and the vessels in which it is kept, but the conditions under which it is kept. It is obvious that milk heated to the degree and for the time shown by the record to be used in the pasteurizing plants in question requires less inspection and regulation prior to its delivery to the pasteurizing plants than raw milk offered for sale to consumers. That condition is recognized by the terms of the ordinance providing the license fee of only $1 per year for farm dairies.

There are approximately 124 licenses for inspected dairies and approximately five licenses for pasteurizing plants. It is obvious that there would be less expense in the licensing and regulation of five plants than there would be for 124 dairies. The difference in the expense is further shown by the fact that there were approximately 2,108 samples from inspected dairies analyzed as against 240 samples from pasteurizing plants analyzed. There is a similar condition with reference to the employees, in that there are 300 employees for inspected dairies and only 100 for pasteurizing plants. That there is more expense incident to the inspection and regulation of dairies from which milk is sold in the raw state than pasteurizing plants from which milk is sold only after having been pasteurized, is clearly shown by the record in this case. Taking all of the evidence of the plaintiffs and the reasonable inferences that may be drawn therefrom, there is no testimony in this record of any such discrimination in the provisions of the ordinance attacked as can be

determined by this court to be arbitrary, unjust, or oppressive, and, in the opinion of this court, no constitutional or statutory right of the plaintiffs will be infringed by the enforcement of this ordinance.

We do not consider it necessary to cite authorities at length in support of this conclusion. They are summarized in a note shown beginning at page 236 of 18 A. L. R. to an opinion of the Supreme Court of North Dakota entitled Cofman v. Ousterhous, reported at page 219 of that volume. In that note it is said:

"But there is something about the possibilities of harmfulness in milk as a food which seems to appeal to the imagination in a way in which other foods do not, and therefore regulations have been made and sustained by the courts which to ordinary common sense seem to be little less than absurd."

We quote from the case of Koy v. Chicago, 263 Ill. 122, 104 N. E. 1104, as reported in the note referred to, as follows:

" 'Not only may laws and ordinances require that milk offered for sale shall be pure, wholesome, and free from the bacilli of any disease, but they may and do, in order to produce this result, prescribe the manner in which such purity, wholesomeness, and freedom from disease shall be secured and made to appear. The cows may be required to be registered with a designated public authority; the dairies to be conducted and managed according to prescribed regulations, and together with the dairy utensils, subjected to inspection; the receptacles in which milk is contained to be of prescribed character and capacity; the labels to be placed according to fixed regulations, and to contain certain required information; the milk to be prepared in the manner, at the times, and by the means directed, and at all times to be subject to inspection. These may be drastic restrictions upon a private business, but experience and the increasing knowledge of the causes of disease and the agencies of its propagation have demonstrated the necessity of such restrictions to the preservation of the public health'."

We quote from the case of State v. Broadbelt, 89 Md. 565, 43 Atl. 771, as reported in the note, as follows:

" 'The entire act is strictly a police regulation, enacted for the purpose of preserving the public health. The strides which our knowledge of bacteriology has made in recent years are generally known; and the ubiquitous microbe has been shown to be a potent agent in the propagation of disease. Tuberculosis—identical, it is said, with consumption in man—is caused by the organism known as "Koch's bacillus," and is readily communicable through milk. Diphtheria is another contagious disease whose specific organism finds in milk favorable conditions of growth; and there is abundant evidence to show that contaminated milk transmits this contagion. Cholera has again and again been traced to the same source; and scarlet fever is generally believed to be communicable by infected milk, and it is said that it may be even caused by an eruption on the udder. Typhoid fever bacilli have been detected in milk supposed to be wholesome. Besides conveying disease, milk occasionally contains certain germs which form poisonous products known as "ptomaines." Milk may carry the bacilli of these, and perhaps other deadly diseases, to infancy, to adolescence, and to age; to the delicate and to the robust alike, and to persons in every class and condition of society. It may receive these germs direct from the cow, if the cow be unhealthy; or it may absorb them from the dairy, the dairy utensils, or the stable, if these be uncleanly. Thorough inspection of cattle and dairies may reduce the frequency of infection. The preservation of the public health by preventing the sale of infected milk, or of milk that may come from infected sources, when milk by reason of its almost universal use, in one form or another, as an article of food, is especially likely to spread disease, is one of the most imperative duties of the state, and obviously one most incontestably within the scope of the police power. * * * A dairyman has no right to sell milk that may be contaminated, or that may be given by diseased cows, or may be kept on uncleanly premises, or in unsterilized utensils; and, if he undertakes to sell milk at all to cities, towns, and villages, he must submit to such reasonable sanitary regulations respecting his property used in that business, as the Legislature may deem necessary to prevent that property from being the source or origin of infectious and contagious diseases. No matter how absolute his title, he holds his property subject to this liability—that his use of it may be so regulated as that it shall not be injurious to the community'."

The judgment of the trial court is affirmed.

LESTER, C. J., CLARK, V. C. J., and RILEY, HEFNER, CULLISON, SWINDALL, McNEILL, and KORNEGAY, JJ., concur.