## PEGGY STARR *v.* ORIOLE CAFETERIAS, Inc.

[No. 5, October Term, 1943.]

*Decided November 3, 1943.*

The cause was argued before SLOAN, C. J., DELAPLAINE, COLLINS, MARBURY, GRASON, MELVIN, ADAMS, and BAILEY, JJ.

*David J. Markoff* and *Harold Buchman* submitted on brief for the appellant.

*William D. MacMillan,* with whom were *Semmes, Bowen & Semmes* on the brief, for the appellee.

MARBURY, J., delivered the opinion of the Court.

This is a suit against the owner and operator of a restaurant by a patron. It is alleged that the plaintiff, with others, purchased a meal from the defendant, and that included in this meal was a plate of loose corn. She ate this corn and became ill. She alleges that the corn was in a diseased and rotten condition and unfit for human consumption, and her illness was due to the negligence of the defendant in selling it.

At the trial of the case in the Baltimore City Court the plaintiff testified that she was a child's nurse and did light house work, and that in company with her em-

ployers and their two children, she went to the cafeteria owned and operated by the defendant for dinner. She ordered and paid for french fried potatoes, steak, a dish of corn, rolls, butter, and coffee. She testified that she started eating her corn and tasted a piece of steak, and then became ill. Later she said that she had a piece of steak and some french fried potatoes in addition to the corn. She was taken to the ladies' rest room, but her troubles continued, and she was then taken to the office of Dr. Weinstock, who gave her first aid, attended her at home every day for two weeks, and then after she was able to walk, she went to his office every day for two weeks. In all she was sick for six weeks. On cross-examination she said that she had been given the corn of the oldest child whose mother didn't want her to have it, and she had eaten hers and the child's also, and had nearly finished both orders, when she was taken sick, and that she had eaten some steak up to that time.

The attending physician, who was a graduate of the University of Maryland Medical School, and who had been in general practice since 1928, testified that the plaintiff came to his office complaining of severe pains in the stomach, and that he kept her there about one-half or three-fourths of an hour before she was able to leave. She had vomited in his waiting room, and he took her to his back office room, and sat her down at the basin, and washed her stomach out several times. He was asked what was her ailment and stated that it was acute gastritis. He was then asked in his diagnosis of the case did he inquire what she had eaten, and he testified that the plaintiff told him that she had eaten supper which consisted of fruit juice, steak and corn. That is what she had on the table, and that she had partaken of the fruit juice and corn when she became violently ill. He said that he had also been told by her what she had for breakfast in the morning and what she had for lunch that day. He was then asked in the form of hypothetical question what in his opinion was the cause of her condition. The objection to this ques-

tion was sustained and that is the first exception in the record.

Dr. Weinstock was then asked whether as the attending physician of the plaintiff he had formed any opinion as to the cause of her illness, and he said he had, and upon being told by the court he could tell what that was, without referring to any specific kind of food, he said that she had gastritis, which means an inflammation of the lining of the stomach brought on by food poisoning. He further said that he saw what she vomited in the basin and that was practically all corn and some gastric juices, i. e., the stomach juice; that he saw her at 8 o'clock in the evening and she had then been ill about one hour and a half. He was then asked if he was able to say as the attending physician, based on his findings, what was the specific food that she had eaten that caused her condition. Objection to this question was sustained and that is the basis for the third exception. The second exception was taken during the giving of the testimony just outlined, and appears in the record after the statement of the court that the doctor could give his opinion without referring to any specific kind of food. This exception apparently refers to the court's statement, and raises the same question as exception number three. They will be treated together.

The first exception may be briefly disposed of. The attending physician was asked a hypothetical question. This is permissible and has been so held by this court. *Langenfelder v. Thompson*, 179 Md. 502, 20 A. 2d 491. When such a question is asked, however, whether of the attending physician or of an expert who is called to testify because of his special knowledge, it must contain all of the material facts in evidence essential to the formulation of a rational opinion. *Mathiesen Alkali Works v. Redden*, 177 Md. 560, at page 565, 10 A. 2d 699, and cases there cited. The hypothetical question asked of Dr. Weinstock contained no reference whatever to food, other than corn, which she had either at dinner in the restaurant of the defendant or at any other

meal during the day. In effect it was the same as asking the doctor if she had eaten corn and gotten sick, what food had she eaten that caused her sickness. It was not a proper hypothetical question, framed in accordance with the rules laid down by this court, and the ruling of the trial court in refusing to permit it to be answered was correct.

When we come to the other exceptions we have a different situation. We have the attending physician asked to give his opinion based upon his own findings as to what specific food caused the gastritis. In a recent thorough and careful opinion delivered for this court by Judge Delaplaine the subject of medical testimony on accidents and injuries was thoroughly discussed, and this conclusion was stated: "We adopt the prevailing view that the opinions of medical experts are admissible as to the cause which produced, or probably produced, or might have produced, a certain physical condition," and further, "We follow the general rule that when a witness is called to express an opinion based upon personal observation, it is unnecessary to submit to him a hypothetical question before he can express his opinion." *Langenfelder v. Thompson,* 179 Md. 502, 20 A. 2d 491. This decision is based upon the theory that the opinion of such a witness aids the jury in ascertaining the truth. It is stated by Professor Wigmore in his *Treatise on Evidence,* 3d Ed., Vol. 7, page 21, paragraph 1923: "But the only true criterion is: On this subject can a jury from this person receive appreciable help?"

In some cases it has been held that an expert witness should not be allowed to give his opinion on facts which the jury require no special knowledge to determine. That at times has been carried too far, and has prevented the jury from getting information which might be of material value to them in arriving at their verdict. It might be entirely possible for a jury of laymen, hearing that a person became violently ill of gastritis produced by food poisoning, to determine what

food caused the poisoning, especially if there is testimony, as there was in this case, that the particular food claimed to have done the damage tasted sour. Nevertheless, it is a help to laymen, untrained in medical science, to have a physician testify that in his opinion certain food was the cause of the illness. His opinion is not final. It need not be accepted by the jury. He is subject to cross-examination on it, and must give, if asked, the reasons which cause him to have such an opinion. The weight of his evidence is entirely with the jury, but it can scarcely be contended that it will not help the jury to reach a conclusion. That is the whole purpose in permitting him to give an opinion. An individual suddenly taken ill with a similar malady might have a definite opinion of his own as to what food caused his illness, but his physician after finding out everything that had been eaten, and after observing the patient's condition, might come to an entirely different conclusion. Certainly the patient would ask his doctor what food had caused him to become sick, and there seems no reason to exclude such a usual and ordinary question, asked of every doctor by every patient, from a jury who would ask the same questions in their own cases, of their own physicians. The object of rules of evidence is not to exclude from the jury things that will help them. Testimony should be excluded which has no proper bearing on the issues in the case, but it cannot be said that a doctor's opinion as to the food which caused his patient's condition has no bearing on the question before the jury in this case.

In addition to the Langenfelder case above mentioned, another recent case in this court indicates clearly the position this court has taken as to such evidence. That was a case of illness, alleged to have been caused by eating corned beef. It was a suit against a manufacturer. About two hours after the beef had been eaten, the plaintiff became ill. A physician was called, he took her to the hospital, and there attended her. He diagnosed her case as botulism, which is a type of food

poisoning. The attending physician had only had one previous case of this malady in his practice of twenty-two years, but had read medical books upon the subject and was apparently qualified to testify. He was asked to state in answer to a hypothetical question his opinion as to the cause of the botulism in the plaintiff, and he replied that the corned beef was the cause of it. He was cross-examined on it, and stuck to his opinion. The court said that the hypothetical question asked him contained all the facts and only the facts essential to the formulation of the opinion sought. It did not specifically request the witness to point out the particular food which caused the disease, "although it was broad enough to permit that construction," and the court then added, "The weight of authority supports the view that medical evidence as to the cause of a particular disease is admissible * * * where the fact would not ordinarily be discovered by or known to laymen having no special knowledge or skill in the science or practice of medicine," and later "* * * it cannot be said that Dr. Williams' statement that Miss Leasure contracted the disease from eating the corned beef is entirely without probative force. As a practicing physician he must be assumed to possess special knowledge and skill in the sciences of medical chemistry, therapeutics, and bacteriology, and with that knowledge to determine with some confidence the kind and condition of food most likely to harbor the germs of disease." *Armour & Co. v. Leasure,* 177 Md. 393, 9 A. 2d 572, 578.

The appellee points out that in the Armour case the court had stated that if any part of the doctor's answer was objectionable to the defendant, he could and should have moved to strike it out, and since he did not do so, it was in for what it was worth. The statement is made that it was because of this remark by this court in the Armour case that the trial judge in the case before us, did not permit Dr. Weinstock to refer to any particular kind of food. If this was the basis for the ruling of the court below, he interpreted too narrowly the

opinion of this court in the Armour case. As we have pointed out, in a later portion of that opinion, it was held that Dr. Williams' statement that the disease was contracted from the eating of corned beef was not without probative force. If it had probative force, it was of course admissible. Dr. Weinstock's opinion likewise would have probative force, and should have been admitted.

We conclude, therefore, that the trial court erred in its rulings contained in the second and third exceptions, that the objections of the appellee, shown in these exceptions, should have been overruled, and that the physician should have been allowed to testify what food in his opinion caused the plaintiff's illness. For that reason, the judgment herein will be reversed, and the case remanded for a new trial.

*Judgment reversed; case remanded for a new trial, costs to the appellant.*