DAVIDSON ET AL. *v.* MILLER, INFANT, ETC. ET AL.

[No. 226, September Term, 1974.]

*Decided September 18, 1975.*

The cause was argued before MURPHY, C. J., and SINGLEY, SMITH, DIGGES, LEVINE, ELDRIDGE and O'DONNELL, JJ.

*Edward C. Mackie,* with whom were *Rollings, Smalkin, Weston & Andrew* and *Robert W. Fox* on the brief, for appellants.

*Bertram M. Goldstein,* with whom were *Jacob & Goldstein* on the brief, for appellees.

DIGGES, J., delivered the opinion of the Court. MURPHY, C. J., concurs in part and dissents in part and filed an opinion concurring in part and dissenting in part at page 86 *infra.*

In this automobile-pedestrian personal injury action, tried in the Baltimore City Court (Carter, J.) after removal from the Superior Court of Baltimore City where the suit was originally instituted, the jury awarded Alenetta Miller, an infant and one of the respondents here, $650,000 as compensation for her injuries, and her mother, Mildred Leggett, who is the other respondent, $1,297.50 as reimbursement for medical expenses she incurred on behalf of her young daughter. Reeling from the impact of this rather substantial verdict for Alenetta, which was reduced to $200,000 through the acceptance by the infant plaintiff of a remittitur nudged by an order of the court pertaining to a new trial motion, the defendants, who are the petitioners before this Court, David Davidson and The Davidson Transfer and Storage Company, appealed from the resulting judgment to the Court of Special Appeals (arriving here pursuant to certiorari issued to that court before it considered the case), asserting that a number of evidential and procedural errors were committed at the trial level. No attack, however, is made upon the jury's determination as to the defendants' negligence; the challenge is confined to the damages aspect of the verdict. We will affirm the judgment as it pertains to the mother, but vacate it so far as it concerns the award in favor of Alenetta and remand this case for a new trial limited to the issue of the damages the child is to receive.

It was in the afternoon of a clear winter day in 1971 that by a simple twist of fate the infant respondent in this case, Alenetta, was severely and permanently injured. Being only four years old at the time, the child was walking home from nursery school hand-in-hand with her mother down Chester Street in Baltimore City when an automobile, driven in a westerly direction on Fayette Street by the individual petitioner and operated for the benefit of the corporate petitioner, passed through a red light at the intersection of Fayette and Chester Streets and collided with a panel truck

traveling southbound.[1] This impact took the panel truck out of its operator's control and propelled it onto the Chester Street sidewalk, where it, without warning, struck Alenetta, hurling the young girl against a brick wall of a building located near the intersection. As a result of this unfortunate occurrence, Alenetta was quickly taken to the Johns Hopkins Hospital and was examined by doctors who, after sedating the child because she was experiencing convulsions, found that she had sustained many serious bodily injuries, especially in the pelvic region. The respondents asked that, as a part of their compensation award for the injuries sustained and the medical expenses incurred in an effort to mend these wounds, the jury be allowed to consider the fact that "the distortion of the pelvis and the presence of . . . an abnormal bar of bone [(which formed in the pelvis)] would prevent the infant . . . from having natural childbirth," requiring instead birth by caesarean section.[2]

With this factual introduction we now turn to the issues which the petitioners assert on this appeal. These are:

"The trial court erred in admitting testimony relating to caesarean section.

"The trial court erred in instructing the jury in a way which permitted it to consider the possibility of future caesarean section.

"Defendants were denied the equal protection of the laws by the refusal of the Superior Court of Baltimore City to remove the case to a court outside the Eighth Circuit.

"The Superior Court of Baltimore City abused its discretion in refusing to remove the case to a court outside the Eighth Circuit.

"The trial court had no power to reinstate the

---

**1.** No one during the course of this litigation has claimed that the panel truck driver was in any way responsible for the accident.

**2.** The name for this operation is possibly derived from the eponymous ancestor (perhaps even Julius himself) of the Roman family Caesar, who accounts say was born in this manner. However, some authorities believe that the term probably originated from the *"lex caesare"* or "law of the Caesars" in pre-Christian Rome, which mandated that when a pregnant woman died the child had to be removed from her abdomen.

judgment and grant a remittitur after having granted a new trial."

## I

What the petitioners are objecting to, under both the first and second exceptions (which we consider together), is the expert medical testimony relating to Alenetta's potential birth-giving problems, admitted by the trial judge over counsel's objection and then submitted to the jury for it to evaluate when assessing damages. Specifically, the petitioners' argument is that the evidence of the future costs and complications which Alenetta might incur when and if she ever gives birth "should have been excluded from the consideration of the jury, since it amounts to no more than a [speculative] possibility of caesarean section in the future, and that is not sufficient to make it admissible evidence."

The respondents attempt to answer this allegation of evidential failure by claiming that the trial testimony of Dr. Liebe Sokol Diamond, a pediatric orthopedic surgeon, provided probative evidence that Alenetta would require caesarean section if she had children. Therefore, they argue, the judge acted properly when he admitted the evidence and permitted the jury to grant the child compensation for that potential consequence.[3] Dr. Diamond testified as follows:

"Q. (Mr. Goldstein [respondents' attorney]) Now, based upon — can you give us an opinion, based upon reasonable medical certainty from the orthopedic point of view, as to whether or not the rotatory deformity and the bar of bone which now exists in Alenetta Miller, which you have said is permanent, whether or not there is a real likelihood from your point of view as an orthopedist, as to

---

3. There was testimony received at trial from other doctors, but this evidence did not indicate the potentiality of caesarean section for Alenetta should she have a child. As the respondents mention in their brief, it merely "schooled [the jury] on the dynamics of the caesarean birth procedure," "the nature of caesarean section and the difference between a caesarean and a natural childbirth."

whether or not she will be prevented from having normal childbirth?

(Mr. Mackie [petitioner's attorney]) Objection.

(The Court) Overruled.

Q. (Mr. Goldstein) You may answer, Doctor.

A. There is certainly considerable concern that she would have difficulty having a child through the normal —

(The Court) I am afraid that isn't answering the question. Can you answer the question?

(The witness) Yes. From the orthopedic point of view, the structure of the pelvis is such that its shape would not readily allow spreading of the symphysis pubis and passage of the head of an average sized infant without some difficulty, because it is not — because the passage is not symmetrical, and because the bar of bone will tend to prevent the symphysis pubis from moving in its normal way.

Q. (Mr. Goldstein) Now, based upon your experience as a medical doctor, if the child cannot have natural childbirth, what procedure for childbirth would be required?

(Mr. Mackie) Objection.

(The Court) Well, I don't know — I will let her answer that question. I don't see the particular relevancy of it from this witness, but you may answer it.

(The witness) This will require the services of an expert obstetrician, who would then have to decide among the varieties of special obstetrical techniques for this particular patient as to what way the childbirth could be best and most safely accomplished for the mother and for the child. This could include a variety of forceps delivery, and it could very definitely include a caesarean section, but the decision for that would have to be in the hands of an expert obstetrician."

Using this testimony as a basis, the trial judge submitted the future childbirth problem to the jury to be considered by it as an element of damages, in these words:

"In assessing the amount of damages, you may consider the health and condition of the plaintiff, Alenetta Miller, before the injuries complained of as compared with the present condition of her health in consequence of said injury. You may also consider the permanent nature of the injuries, and how far they may in the future disable her from engaging in such enjoyment or other acts, activities, for which in the absence of such injury she would be qualified. One of those things I would include in the activities, perhaps it is not the right way to put it, but there is evidence relating to childbirth later on."

In assessing the doctor's answers and, therefore, the correctness of the court's submission to the jury of the issue the respondents contend this testimony raises, we recognize that the introduction of an expert opinion into evidence often serves a valuable purpose; indeed, sometimes, as is the case here on the childbirth issue, it is the only manner in which a litigant can present his claim. This type of testimony, however, should not be received unless "jurors of ordinary judgment and experience are incompetent to draw their own conclusion," *Empire State Ins. Co. v. Guerriero*, 193 Md. 506, 514, 69 A. 2d 259 (1949). This principle was expressed for the Court by Judge Delaplaine in *Langenfelder v. Thompson*, 179 Md. 502, 505, 20 A. 2d 491 (1941), in these words:

"While expert testimony is not admissible on a question which the jurors themselves can decide from the facts, it is admissible when the formation of a rational judgment from the facts requires special training or skill. *Consolidated Gas, Electric Light & Power Co. v. State, use of Smith,* 109 Md. 186, 203, 72 A. 651, 658." *See Lumbermens Mut.*

Cas. Co. v. Ely, 253 Md. 254, 260-61, 252 A. 2d 786 (1969); 7 *Wigmore, Evidence* 21 (3d Ed. 1940).

Even when an expert's testimony would apparently be of assistance to the jury, it has been held many times previously by this Court, as well as by most of the courts in this country, that it still cannot be received unless that opinion be sufficiently definite and certain because, "[i]n matters of proof, neither the courts nor the juries are justified in inferring from mere possibilities the existence of facts, and they cannot make mere conjecture or speculation the foundation of their verdicts." *Ager v. Baltimore Transit Co.*, 213 Md. 414, 421, 132 A. 2d 469 (1957); *Lumbermens Mut. Cas. Co. v. Ely, supra; Montgomery Ward v. Cooper*, 248 Md. 536, 542, 237 A. 2d 753 (1968); *Starr v. Oriole Cafeterias*, 182 Md. 214, 218, 34 A. 2d 335 (1943); *see H. Oleck, Damages to Persons and Property*, § 94 (1961); 18 A.L.R.3d 1, 21-27 (1968); 81 A.L.R. 419 (1932). This evidentiary rule which requires the exclusion of that which is speculative clearly and perhaps most essentially applies to expert medical testimony concerning the future consequences of an injury. The testimony concerning an injury which may only possibly ensue is something too conjectural for the jury to receive or consider; any future complications from a malady which are not probable become a risk which the injured person must bear because the law cannot achieve justice if speculation is to be used as the basis for determining damages. A consequence which rises to the posture of reasonable probability, however, although it is not certain to occur, may be considered in the evaluation of the claim for future pain and suffering. As Judge Prescott said for this Court in *Ager v. Baltimore Transit Co., supra* at 421:

"Maryland cases, in accord with these well-recognized and established principles are all consistent in rejecting the proposition that the jury may form a judgment or conclusion on the basis of testimony which admits of mere possibilities and have stated in various cases that the test to be

applied, whether the question involved is the existence of an injury or its cause, is reasonable probability or reasonable certainty." *See Craig v. Chenoweth,* 232 Md. 397, 194 A. 2d 78 (1963); *Kujawa v. Baltimore Transit Co.,* 224 Md. 195, 167 A. 2d 96 (1961).

Thus, "evidence of prospective damages must be in terms of the certain or probable and not of the possible." *Calder v. Levi,* 168 Md. 260, 265, 177 A. 392 (1935). In the law, as is true in common usage, "probability" exists when there is more evidence in favor of a proposition than against it; mere "possibility" exists when the evidence is anything less.

In this case, Dr. Diamond's testimony as to complications at childbirth, fully quoted above, cannot be said to meet this "probability" test so as to make it admissible, and the judge's jury instruction stemming from it proper. The question asked the doctor was designed to evoke a specific and definitive answer "based upon reasonable medical certainty" as to Alenetta's inability to have children normally. It is manifest from the witness' responses that the doctor did not, and therefore since the question was clear, apparently could not, answer with any level of opinion but conjecture; this leaves her remarks with no probative value. Since it was error to receive into evidence Dr. Diamond's speculative opinion on the issue of Alenetta's potential problem in bearing children, and as this opinion was the only testimony on the subject, it follows that it was likewise error to permit abnormal childbirth complications to be considered by the jury in assessing damages. Consequently a new trial on the issue of damages must be awarded.

## II

The petitioners' next two contentions each attack the action taken by Chief Judge Dulany Foster when he, in response to their "Suggestion for Removal" "to a court outside the Eighth Circuit," transferred the suit from the court in which it was initially filed, the Superior Court of Baltimore City, to another court in the same circuit, the Balti-

more City Court.[4] Because the chief judge did not provide them with a judicial forum beyond the city, the petitioners assert that he either abused his discretion or denied them equal protection of the law as guaranteed by the fourteenth amendment of the United States Constitution.

This constitutional contention raises for the first time the issue of whether the right of removal granted by Article IV, section 8, of the Maryland Constitution violates the "Equal Protection Clause" contained in the Federal Constitution. Section 8 of Article IV provides:

"The parties to any cause may submit the same to the court for determination without the aid of a jury, *and in all suits or actions at law, issues from the orphans' court, or from any court sitting in equity,* and in all cases of presentments or indictments for offences, which are or may be punishable by death, pending in any of the courts of law in this State, having jurisdiction thereof, upon suggestion in writing under oath of either of the parties to said proceedings, that such party cannot have a fair and impartial trial in the court in which the same may be pending, the said court shall order and direct the record of proceedings in such *suit or action, issue,* presentment or indictment, to be transmitted to some other court having jurisdiction in such case for trial; but in all other cases of presentment or indictment pending in any of the courts of law in this State, having jurisdiction thereof, in addition to the suggestion in writing of either of the parties to such presentment or

---

**4.** In Maryland, on the general jurisdiction trial court level, for administrative purposes, there are eight judicial circuits, with the first seven circuits comprised of from two to five counties — however, in each county there is a separate circuit court. Baltimore City alone constitutes the Eighth Circuit. Maryland Constitution, Article IV, section 19. Section 27 of the same article provides:

"There shall be in the Eighth Judicial Circuit, six Courts, to be styled the Supreme Bench of Baltimore City, the Superior Court of Baltimore City, the Court of Common Pleas, the Baltimore City Court, the Circuit Court of Baltimore City and the Criminal Court of Baltimore."

indictment, that such party cannot have a fair and impartial trial in the court in which the same may be pending, it shall be necessary for the party making such suggestion to make it satisfactorily appear to the court that such suggestion is true, or that there is reasonable ground for the same; and thereupon the said court shall order and direct the record of proceedings in such presentment or indictment to be transmitted to some other court, having jurisdiction in such cases, for trial; and such right of removal shall exist upon suggestion in cases when all the judges of said court may be disqualified under the provisions of this Constitution to sit in any such case; and said court to which the record of proceedings in such *suit or action, issue,* presentment or indictment may be so transmitted, shall hear and determine the same in like manner as if such *suit or action, issue,* presentment or indictment had been originally instituted therein; and the General Assembly shall make such modification of existing law as may be necessary to regulate and give force to this provision." [5] (Italicization not in original.)

It is the petitioners' complaint that, while on its face and standing alone this provision gives all civil law litigants in the State one automatic right of removal from the court in

---

5. This amendment is at present set out in Volume 9A of the Maryland Code (1957, 1972 Repl. Vol.), in which there are certain minor typographical deviations from the provision as it appears in Chapter 364 of the 1874 Laws of Maryland (ratified by the voters of this State on November 2, 1875). It is the 1874 printing which is quoted in this opinion. A removal provision first appeared as part of the Maryland Constitution by way of an 1806 amendment to our 1776 constitution. For a history of the differing removal provisions which have appeared in the various constitutions of this State, *see* Shreffler v. Morris, 262 Md. 161, 277 A. 2d 62 (1971); Fountain v. State of Maryland, 135 Md. 87, 108 A. 473 (1919); Downs v. State, 111 Md. 241, 73 A. 893 (1909); 2 *Poe, Pleading and Practice,* 72-80, §§ 90-103 (5th ed. 1925); Comment, *Change of Venue Between Courts in Baltimore City,* 33 Md.L.Rev. 116 (1973); Case note, *Constitutional Limitation on Change of Venue in Criminal Cases,* 13 Md.L.Rev. 344 (1953).

Maryland maintains a distinction between law and equity; this constitutional removal provision does not relate to equity actions. Olson v. Love, 234 Md. 503, 200 A. 2d 66 (1964).

which the suit was initiated to another "court having jurisdiction in such case," the practical effect is that those citizens whose civil law cases come within the jurisdiction of the Eighth Circuit (comprised exclusively of Baltimore City) do not have in reality the same right of removal vis-à-vis those civil litigants whose law actions are brought in any of the counties composing the other judicial circuits.

This claim of unequal treatment is indeed factually buttressed. The removal provision of Article IV, section 8 establishing the right to transfer from one court having jurisdiction to another, leaves the choice of court to the discretion of the removing judge. *Middleton v. Morgan,* 263 Md. 154, 282 A. 2d 94 (1971); *Marzullo v. Kovens Furniture Co.,* 253 Md. 274, 252 A. 2d 822 (1969). *See also* Maryland Rule 1200 c 2 (b). When a motion for removal is submitted to a judge in any of Maryland's twenty-three counties, regarding an action filed in the county's circuit court, he must transfer the case to an appropriate circuit-level court in either another county or Baltimore City, because each county has only one such court. Article IV, section 20 of the Maryland Constitution. On the other hand, Baltimore City has three civil common law circuit-level courts (Superior Court, Court of Common Pleas, and the Baltimore City Court) all of which have, with a few minor exceptions, "concurrent jurisdiction in all civil common law cases." Maryland Constitution, Article IV, sections 27 and 28. Formerly, each of these three courts had its own judges, who were designated to sit on a court for a year and then rotated to another court (not necessarily one of these three) in the Eighth Circuit, and its own panel of prospective jurors, who did not sit on cases in the other two courts or in the Criminal Court of Baltimore; consequently, if a case was removed from one court in Baltimore City to another, that case would be tried by a different judge and jury. A partial explanation of how this unique, complicated and somewhat superfluously cumbersome court system in Baltimore City operated (still true on paper today), prior to the consolidated assignment rule effectuated on January 1, 1947, which was later refined on February 10, 1955 upon a resolution adopted

by the members of the Supreme Bench, was provided by Chief Judge Hammond for the Court in *Middleton v. Morgan, supra* at 157 when he quoted the following language from *Weiskittle v. State,* 58 Md. 155, 158 (1882):

> "Baltimore City is a complete Judicial Circuit, (the 8th), and in that circuit there are several distinct courts, each with its distinct organization and jurisdiction defined in the Constitution.
>
> "The Superior Court of Baltimore City is one court within that circuit, and the [Baltimore City Court] is another, each with its separate machinery of officers, clerks and records, and at any stated period a different judge and different juries. It is true, that the jurors are drawn from the body of the people at large in Baltimore City, but one panel is required to be drawn for the Superior Court, and a different one for the [Baltimore City Court]."

Consequently, it was held in *Weiskittle* that the transferral of a case from one circuit-level law court in Baltimore City to another "gratifies the constitutional provision of a removal to some other court having jurisdiction." *Id.* at 159. The judicial arrangement outlined in *Middleton* and *Weiskittle* is no longer completely in effect, as over the years there have been numerous changes made in the system. Today the Eighth Circuit judges, although designated to sit on a yearly basis in a specified court, may preside at any time over cases from any other court in that circuit, including the three civil law courts; today the jurors, although assigned to one of the three common law courts, can and do serve in any of these three courts. As a result, while removal from a county circuit court necessarily places the case in the circuit court of another county or in Baltimore City, guaranteeing a new jury selected from an entirely different locality, when the case originates in one of the circuit-level civil law courts in Baltimore City and the constitutionally provided automatic right of removal in civil cases is utilized, then it is satisfied, if the judge so exercises his discretion in this manner, simply by a transferral from

that court to another common law court in Baltimore City, *Middleton v. Morgan, supra; Weiskittle v. State, supra.* This can and sometimes does result in the case being tried by a jury drawn from the same panel the litigant attempted to avoid.[6] In reality then, usually no removal whatsoever takes place except one strictly on paper — the case is taken from one court clerk's docket and put on that of another, making removal for Baltimore City civil law litigants a futile exercise, comparable to the attempt of Gulliver's scientist to extract sunbeams from cucumbers.[7]

The potential harshness of this inequality is mollified by the fact that the trial judge's decision to remove the case to a certain court is reviewable for abuse of discretion, as the constitutional right of removal, and indeed due process of law, "contemplates a removal to a court where the jury is unprejudiced and will render a fair and impartial verdict based on the law and the evidence . . . [such that, if this] appears doubtful . . . , the case should be removed to some other circuit or some other section of the State." *Jones v. State,* 185 Md. 481, 486, 45 A. 2d 350 (1946); *see Lee v. State,* 161 Md. 430, 157 A. 723 (1931). Thus the inequality can only exist in those civil law cases in Baltimore City where the litigant requesting removal either is not in any way deprived of a fair trial or asserts some proof of deprivation but not enough to make it an abuse of discretion if the trial judge fails to send the case outside of the City; this compared with a civil law litigant in any one of the counties who, without much more than a simple request, can automatically, without proof of potential unfairness, obtain a removal to a court located in a different county or Baltimore City.

Since the removal right of civil law litigants amounts to one thing in the counties but quite another in Baltimore

---

**6.** A different situation prevails in Baltimore City's criminal court — since there is just one such court (though comprised of several parts), a motion for removal which is granted can be effectuated only by transferring the trial out of Baltimore City.

**7.** In 1974 31 litigants in Baltimore City requested removal; of these cases, 26 were merely transferred on paper to another court in Baltimore City, with only 5 being removed to another jurisdiction. This statistic is furnished by the eighth circuit administrative office.

City, the issue becomes whether this particular inequality of treatment constitutes a violation of the United States Constitution which, by its fourteenth amendment, mandates that "[n]o State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." This is a question which, so far as we have been able to discern, has never been directly answered in this or any other jurisdiction.

The first step in our analysis must be to utilize the conventional mosaic established by the United States Supreme Court in equal protection cases to determine whether Maryland's unequal right of removal is to be assessed under the "strict judicial scrutiny" test (promoting a compelling governmental interest) or the "rational basis" test (merely possessing a reasonable justification). Under the first of these tests we assess Article IV, section 8, in order to determine whether it "operates to the disadvantage of some suspect class or impinges upon a fundamental right . . . thereby requiring strict judicial scrutiny." *San Antonio Independent School District v. Rodriguez*, 411 U. S. 1, 17, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973). In the context of this dispute, the class of citizens who are constitutionally deprived of an equal right to automatic removal is composed of all litigants who civilly sue or are sued in Baltimore City's civil law circuit-level courts. This is not a "suspect class" as thus far denominated by the United States Supreme Court. *See, e.g., Graham v. Richardson*, 403 U. S. 365, 372, 91 S. Ct. 1848, 29 L.Ed.2d 534 (1971) (alienage); *Loving v. Virginia*, 388 U. S. 1, 9, 87 S. Ct. 1817, 18 L.Ed.2d 1010 (1967) (race); *Oyama v. California*, 332 U. S. 633, 644-46, 68 S. Ct. 269, 92 L. Ed. 249 (1948) (nationality). To determine if the inequality present in this case restricts a "fundamental right," we must assess whether involved here "is a right explicitly or implicitly guaranteed by the [Federal] Constitution." *San Antonio Independent School District v. Rodriguez, supra* at 43; *see Eisenstadt v. Baird*, 405 U. S. 438, 92 S. Ct. 1029, 31 L.Ed.2d 349 (1972); *Dunn v. Blumstein*, 405 U. S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 (1972). There can be no doubt that in this country and in this State there is dedication to the

preservation of the fundamental right to a fair and impartial jury trial, be it criminal, *Groppi v. Wisconsin*, 400 U. S. 505, 91 S. Ct. 490, 27 L.Ed.2d 571 (1971), or civil, *Dimick v. Schiedt*, 293 U. S. 474, 55 S. Ct. 296, 79 L. Ed. 603 (1935); *Bank of Columbia v. Okely*, 4 Wheat. 235, 4 L. Ed. 559 (1819), such that "A court of general jurisdiction ought not to be left powerless under the law to do within reason all that the conditions of society and human nature permit to provide[, equally to all litigants,] an unprejudiced panel for a jury trial." *Crocker v. Justices of Superior Court*, 208 Mass. 162, 94 N. E. 369, 377 (1911). From this it is clear that individual litigants as well as the public have a paramount interest in seeing that an unbiased jury assist in the administration of justice. In fact so dearly do we treasure the integrity of the jury trial process in Maryland that the General Assembly of this State in 1969 enacted a comprehensive and uniform statute regulating the selection and service of jurors in all of the trial courts of this State where juries are utilized. Maryland Code (1975), Courts and Judicial Proceedings Article, §§ 8-101 to -401. However, the inequality of removal treatment as between civil law litigants in Baltimore City and those in the counties does not encompass those cases in which there is proof that a fair trial may not reasonably be expected in the City such that it would constitute an abuse of discretion if the judge does not transfer the action to a court in another judicial circuit. Therefore, the particular unequal removal right involved here cannot be categorized as "fundamental."

Since "strict judicial scrutiny" is not the applicable examination to be given the inequality under fire in this case, we are relegated in our analysis to determine if Article IV, section 8 "rationally furthers some legitimate, articulated state purpose." *San Antonio School District v. Rodriguez, supra* at 17. This type of inquiry involves an assessment of the enactment under attack so as to determine whether the law has a "rational basis" which justifies the inequality springing from it. As was stated in *Salsburg v. Maryland*, 346 U. S. 545, 553 n. 9, 74 S. Ct. 280, 98 L. Ed. 281 (1954):

" '. . . It is . . . a maxim of constitutional law that a legislature is presumed to have acted within constitutional limits, upon full knowledge of the facts, and with the purpose of promoting the interests of the people as a whole, and courts will not lightly hold that an act duly passed by the legislature was one in the enactment of which it has transcended its power.' *Atchison, T. & S.F. R. Co. v. Matthews*, 174 U. S. 96, 104, 19 S. Ct. 609, 612, 43 L. Ed. 909. 'A statutory discrimination will not be set aside as the denial of equal protection of the laws if any state of facts reasonably may be conceived to justify it.' *Metropolitan Casualty Ins. Co. v. Brownell*, 294 U. S. 580, 584, 55 S. Ct. 538, 540, 79 L. Ed. 1070."

We utilize this rational basis test though aware that in *Hogan v. Rosenberg*, 24 N.Y.2d 207, 247 N.E.2d 260 (1969) (reversed by the United States Supreme Court on other grounds, *sub nom., Baldwin v. New York*, 399 U. S. 66, 90 S. Ct. 1886, 26 L.Ed.2d 437 (1970)), a case upholding a statute which denied jury trials in misdemeanor cases in New York City while permitting them elsewhere in New York State, the highest court of that state said, "territorial discrimination as between different states and even as between different parts of the same state is not of itself violative of the equal protection clause, even if the State has no reasonable basis for making such a distinction." 247 N.E.2d at 265. *See also Mathis v. North Carolina*, 266 F. Supp. 841 (M.D. N.C. 1967). However, as this Court said in *Matter of Trader*, 272 Md. 364, 389, 325 A. 2d 398 (1974), speaking through Chief Judge Murphy, "Unlike *Hogan* and *Mathis*, the Maryland cases seem to require a rational basis for territorial discrimination as between different parts of the State. . . . [And] that while distinctions and classifications may relate to territorial divisions of a State, to be valid they must be predicated on a 'proper basis' or 'reasonable ground.' " In fact the rational basis analysis in territorial discrimination situations was applied in *Matter of Trader, supra; Franklin v. State*, 264 Md. 62, 285 A. 2d 616

(1972) adopting the reasoning and the holding of *Long v. Robinson*, 316 F. Supp. 22 (D. Md. 1970), *aff'd*, 436 F. 2d 1116 (4th Cir. 1971); *Md. Coal Etc. Co. v. Bureau of Mines*, 193 Md. 627, 69 A. 2d 471 (1949); *State v. Broadbelt*, 89 Md. 565, 43 A. 771 (1899).

Before applying the rational basis test to the removal procedure which exists in this State, we will consider several United States Supreme Court cases which, although not directly on point, merit mention. In *Missouri v. Lewis*, 101 U. S. 22, *sub nom., Bowman v. Lewis*, 25 L. Ed. 989 (1880), the Supreme Court rejected the assertion that Missouri violated the "Equal Protection Clause" by allowing litigants in some localities to appeal directly to the state supreme court while forcing litigants elsewhere in that state to appeal to an intermediate appellate court and then limiting the appeals which could be taken from that court to the state's highest court. The Supreme Court of the United States concluded that:

> "there is nothing in the Constitution to prevent any State from adopting any system of laws or judicature it sees fit for all or any part of its territory. If the State of New York, for example, should see fit to adopt the civil law and its method of procedure for New York City and the surrounding counties, and the common law and its method of procedure for the rest of the State, there is nothing in the Constitution of the United States to prevent its doing so. This would not, of itself, within the meaning of the 14th Amendment, be a denial to any person of the equal protection of the laws. . . . It means that no person or class of persons shall be denied the same protection of the laws which is enjoyed by other persons or other classes in the same place and under like circumstances.
>
> "The 14th Amendment does not profess to secure to all persons in the United States the benefit of the same laws and the same remedies. Great diversities in these respects may exist in two States separated

only by an imaginary line. On one side of this line there may be a right of trial by jury, and on the other side no such right. Each State prescribes its own modes of judicial proceeding. If diversities of laws and judicial proceedings may exist in the several States without violating the equality clause in the 14th Amendment, there is no solid reason why there may not be such diversities in different parts of the same State. A uniformity which is not essential as regards different States cannot be essential as regards different parts of a State, provided that in each and all there is no infraction of the constitutional provision. Diversities which are allowable in different States are allowable in different parts of the same State. Where part of a State is thickly settled, and another part has but few inhabitants, it may be desirable to have different systems of judicature for the two portions; trial by jury in one, for example, and not in the other. Large cities may require a multiplication of courts and a peculiar arrangement of jurisdictions. It would be an unfortunate restriction of the powers of the State Government if it could not, in its discretion, provide for these various exigencies." 101 U. S. at 31-32, 25 L. Ed. at 992.

Nearly seventy-five years later, in *Salsburg v. Maryland,* 346 U. S. 545, 74 S. Ct. 280, 98 L. Ed. 281 (1954), the Supreme Court relied on *Lewis'* broad language to sustain, against an equal protection challenge, a Maryland statute which permitted illegally seized evidence to be introduced at trial in certain gambling misdemeanor prosecutions in three counties but not elsewhere in the State.[8] The Court added:

"Whatever may be our view as to the desirability of the classifications, we conclude that the 1951

---

**8.** The case was decided prior to *Mapp v. Ohio,* 367 U. S. 643, 81 S. Ct. 1684, 6 L.Ed.2d 1081 (1961), which held that "all evidence obtained by searches and seizures in violation of the [Federal] Constitution is, by that same authority, inadmissible in a state court." 81 S. Ct. at 1691.

amendment is within the liberal legislative license allowed a state in prescribing rules of practice. A state has especially wide discretion in prescribing practice relating to its police power, as is the case here.

\* \* \*

"There seems to be no doubt that Maryland could validly grant home rule to each of its 23 counties and to the City of Baltimore to determine this rule of evidence by local option. It is equally clear, although less usual, that a state legislature may itself determine such an issue for each of its local subdivisions, having in mind the needs and desires of each. Territorial uniformity is not a constitutional requisite. *Ocampo v. United States*, 234 U. S. 91, 98-99, 34 S. Ct. 712, 714-715, 58 L. Ed. 1231.

"Maryland has followed a policy of thus legislating, through its General Assembly, upon many matters of local concern, including the prescription of different substantive offenses in different counties. The cumbersomeness of such centrally enacted legislation as compared with the variations which may result from home rule is a matter for legislative discretion, not judicial supervision, except where there is a clear conflict with constitutional limitations. We find no such conflict here." 346 U. S. at 549-50, 552-53, 74 S. Ct. at 282, 284 (footnotes omitted).

The *Lewis* and *Salsburg* cases probably are the Supreme Court's most definitive statements that uniformity of law within different parts of the same state is not necessarily required under equal protection. These two cases, however, have been given a somewhat restricted, and we think appropriate, interpretation by H. Horowitz and D. Neitring in an article entitled *Equal Protection Aspects of Inequalities in Public Education and Public Assistance*

*Programs From Place to Place Within a State,* published in 15 U.C.L.A. L. Rev. 787, 790-91 (1968), as follows:

". . . *Lewis* and *Salsburg* must be more narrowly viewed [than some of the language used in these two cases would indicate]. The Court tempered its broad language with more traditional rational-basis or reasonable-classification terminology. The two cases are better understood as resting on findings of adequate functional justifications for the intrastate territorial differences — *i.e.,* the classifications were reasonable, considering the reasons for the classifications and the seriousness of the impact on those who contended they were adversely affected. In *Lewis,* for example, the Court pointed out that in large cities there may be a multiplication of courts which may require special adjustments of appellate jurisdictions. And the harm to the individual from the classification which provided appeals for some persons to the St. Louis Court of Appeals rather than to the Missouri Supreme Court was not of relatively great magnitude. As the Court pointed out, the appellant in *Lewis* did have an appeal available to him, no less than did others in the state: 'It is not for us . . . to say that these courts do not afford equal security for the due administration of the laws of Missouri within their respective jurisdictions. [101 U. S. at 33, 25 L. Ed. at 993.] Given the reasons of convenience and economy in judicial administration which led to creation of a separate appellate court in heavily populated areas, and the relative lack of serious impact on the individual whose appeal was to that court, it is not surprising that the Court found no violation of the equal protection clause.

"A similar balancing can be inferred from *Salsburg.* There the Court said that a state government might well find reason to prescribe, at least on an experimental basis, variations in procedure in attempting to cope with problems

related to varying population density. The Court pointed out that the statute permitting admission of illegally obtained evidence in a few counties did not establish a different offense in those counties but dealt only with 'rules of practice.' 'Rules of evidence, being procedural in their nature, are peculiarly discretionary with the law-making authority . . . .' [346 U. S. at 550, 74 S. Ct. at 283.] The Court was clearly suggesting the distinction in the seriousness of impact on the individual between rules of procedure and rules of conduct. Moreover, the Court relied on expressed justifications for the different standards — the desirability of experimentation and the variation in the magnitude of the 'evil' from place to place.

"*Missouri v. Lewis* and *Salsburg v. Maryland* are not, then, cases which establish that 'territorial uniformity is not a constitutional requisite.' They establish that territorial uniformity is not an *absolute* constitutional requisite. A state, they should be understood to say, does not violate the equal protection clause by establishing rules for the administration of justice on a territorial basis if there are adequate justifications for the classification and the impact on individuals affected adversely by the classification is not of relatively serious magnitude." (footnotes omitted).

We think the same may be said of *Hayes v. Missouri*, 120 U. S. 68, 7 S. Ct. 350, 30 L. Ed. 578 (1887) and *Chappell Chemical & Fertilizer Co. v. Sulphur Mines Co.*, 172 U. S. 474, 19 S. Ct. 268, 43 L. Ed. 520 (1899). In *Hayes* the Supreme Court concluded that the equal protection clause was not violated by a Missouri statute which provided: "in all capital cases, except in cities having a population of over 100,000 inhabitants, the state shall be allowed eight peremptory challenges to jurors, and in such cities shall be allowed fifteen." In concluding that this statute did not violate the equal protection clause the Court stated:

"Allowing the state 15 peremptory challenges in

capital cases, tried in cities containing a population of over 100,000 inhabitants, is simply providing against the difficulty of securing, in such cases, an impartial jury in cities of that size, which does not exist in other portions of the state. So far from defeating, it may furnish the necessary means of giving, that equal protection of its laws to all persons, which that amendment declares shall not be denied to any one within its jurisdiction." 120 U. S. at 72.

In *Chappell* the Supreme Court held that the equal protection clause was not offended by virtue of the fact that the Supreme Bench of Baltimore City, under its constitutionally authorized rule making power (Article IV, section 39 of the Maryland Constitution), mandated that a Baltimore City litigant had to request a jury trial within a time period which was different from that required in the rest of the State. The Supreme Court summarily dismissed the constitutional attack as "untenable" without further explanation. We can only surmise that the Supreme Court found no difficulty recognizing that this court rule might have had any number of rational bases, not the least of which could have been the volume of litigation in Baltimore City as compared with that in the counties. In short, in *Lewis, Salsburg, Hayes* and *Chappell* the Supreme Court was not shown that the procedural territorial variations present in those cases were without rational bases; in fact, in all these cases there were reasonable justifications for the varying treatment afforded litigants in different localities. *See also Metropolitan Cas. Ins. Co. v. Brownell,* 294 U. S. 580, 55 S. Ct. 538, 79 L. Ed. 1070 (1935) (laws establishing discrimination between foreign and domestic corporations not violative of equal protection if differences between such corporations have any rational relationship to legislative command); *Bain Peanut Co. v. Pinson,* 282 U. S. 499, 51 S. Ct. 228, 75 L. Ed. 482 (1931) (law establishing more extensive venue for actions against corporations than that fixed for private citizens found constitutional as being "reasonable"); *Power Manuf. Co. v. Saunders,* 274 U. S. 490, 47 S. Ct. 678,

71 L. Ed. 1165 (1927) (law authorizing actions against foreign corporations in any county in the state, as compared with actions against a domestic corporation having to be brought in the county where it has place of business or chief officer resides, held unconstitutional as violative of equal protection since classification is without rational basis); *Cincinnati Street R. Co. v. Snell*, 193 U. S. 30, 24 S. Ct. 319, 48 L. Ed. 604 (1904) (law challenged which gave individual greater right to transfer case to a different court than a corporation, held not to violate equal protection since rule justified by the fact that in both forums "equality of law governs and equality of administration prevails"). This Court, aligned with the tenor of these cases, has not hesitated to strike down, on equal protection grounds, territorial inequalities that lacked rational justification. *Franklin v. State; Md. Coal Etc. Co. v. Bureau of Mines*, both *supra.*

We now turn to this case. But before we determine if there is a rational basis for the inequality, heretofore identified, generated by Article IV, section 8, it is essential to comprehend the purpose this removal provision is designed to serve. As was stated by Judge Miller for this Court in *Cooke v. Cooke*, 41 Md. 362, 372 (1875):

> "The object [of removal is] to get rid of the influence of local prejudice in the community from which the jury to try the case [is] to come, and thus, as far as practicable, to secure a fair and impartial trial by jury."

More than fifty years later, Judge Parke for this Court in *Baltimore v. Libowitz*, 159 Md. 28, 31, 149 A. 449 (1930), expressed a similar conclusion when he stated:

> "The evil to which the right of removal is addressed is the undue influence of local passion, prejudice, or interest, to which jurors as a class are peculiarly subject and responsive and which are often reflected in their verdicts to the injury of a litigant." *See Johnson v. State*, 258 Md. 597, 267 A. 2d 152 (1970).

The Supreme Judicial Court of Massachusetts, in *Crocker v.*

*Justices of the Superior Court,* 208 Mass. 162, 94 N. E. 369, 376-77 (1911), reviewed the opinions of courts around the country concerning removal and reached a conclusion, which we think is equally applicable in this State, that:

> "the great weight of authority supports the view that courts, which by statute or custom possess a jurisdiction like that of the King's Bench before our Revolution, have the right to change the place of trial, when justice requires it, to a county where an impartial trial may be had."

And then the court added:

> "If the matter is considered on principle and apart from authority, the same conclusion is reached. It is inconceivable that the people who had inherited the deeply cherished and hardly won principles of English liberty and who depleted their resources in a long and bloody war to maintain their rights of freemen, should have intended to deprive their courts of the power to secure to every citizen an impartial trial before an unprejudiced tribunal. . . . There can be no justice in a trial by jurors inflamed by passion, warped by prejudice, awed by violence, menaced by the virulence of public opinion or manifestly biased by any influences operating either openly or insidiously to such an extent as to poison the judgment and prevent the freedom of fair action. Justice cannot be assured in a trial where other considerations enter the minds of those who are to decide than the single desire to ascertain and declare the truth according to the law and the evidence."

Although the United States Constitution does not require that a state provide an absolute, as distinguished from a discretionary, right of removal, it can be gleaned from this discussion that removal when necessary to obtain a fair and impartial jury trial is basic to the concept of justice as guaranteed by both the law of this State and the Federal

Constitution.[9] This corollary brings into focus the issue in the instant case — in the light of the vital objective of the right of removal as it relates to fair and impartial jury trials, can the unequal treatment generated by Article IV, section 8 of the Maryland Constitution be justified in terms of possessing a rational basis?

This Court has previously recognized that a rational basis, and thus constitutionality for equal protection purposes, will be presumed unless "a clear and convincing showing by the party assailing the legislative classification [proves] that it does not rest upon any reasonable basis, but is essentially arbitrary," *Matter of Trader, supra* at 400. Frequently, as was true in *Long v. Robinson, supra,* a court reaches a conclusion as to rational basis anchored on testimony or documentary proof; however, even though the petitioners here presented no such evidence on the point, this issue so peculiarly involves the judicial process, about which (especially under our constitutionally-provided rule-making power (Article IV, sections 18 and 18A)) it is our responsibility to have a particular familiarity, that we here take judicial notice of the essential facts which assail the conclusion that there exists a rational basis for this State's unequal constitutional automatic right of removal. *Cf. Greenberg v. Dunn,* 245 Md. 651, 659, 227 A. 2d 242 (1967).

Perhaps when this particular removal provision became law in 1875 there was a justification for the unequal treatment based on the population differential between the counties and Baltimore City — according to census statistics from that period, more than one-third of the State's population resided in the City, the rest of the citizenry being spread among the several counties. Theoretically, it could be thought, local passion, prejudice and interest could easily infest the sparse population of the counties, while the same would generally not be true in Baltimore City because of the anonymity provided by the City's comparatively massive population. Such a premise, even as to the days before

---

**9.** Because of the all-encompassing language of Article IV, section 8, certain non-jury cases are also removable under its provisions. Greenberg v. Dunn, 245 Md. 651, 227 A. 2d 242 (1967).

instant mass communication, may be questioned. Even if then true, however, we take judicial notice of the fact that since the latter half of the nineteenth century there have been significant increases and shifts in Maryland's population to the extent that, according to the most recent demographic statistics, although Baltimore City remains the most populated jurisdiction, two counties are now close on its heels, with others but a few steps behind. Furthermore, four counties today have considerably more citizens than did Baltimore City when this particular removal provision became effective in 1875.[10] Therefore, differences in population statistics are no longer dramatic enough to provide a rational basis for treating civil litigants in Baltimore City differently from those in the counties, or vice versa.

Another potential justification which might be suggested as a rational basis for the inequality — that if cases being removed in Baltimore City could only be transferred to the courts in the counties the latter would be overwhelmed — stems from the difference between the caseloads of the county and City courts. *See Hogan v. Rosenberg, supra.* Although no statistics are readily available, it would be logical to expect that Baltimore City, circa 1875, a commercial center with approximately one-third of the State's population, would handle the predominant amount of litigation. Considering that the circuit courts in the counties at that time had few judges, limited facilities and were not in continuous session to hear cases at law, the fear of their being drowned in a flood of litigation removed from Baltimore City may well have been very substantial. Today,

---

**10.** These conclusions are drawn from the following statistics obtained from the United States Bureau of Census and the Population Estimate Division of the Maryland Department of Health.

|  | 1870 | 1880 | July 1, 1973 | July 1, 1975 |
|---|---|---|---|---|
| State | 780,804 | 934,943 | 4,073,940 | 4,145,400 |
| Baltimore City | 267,354 | 332,313 | 862,620 | 832,800 |
| Baltimore County | 63,387 | 83,336 | 642,920 | 653,100 |
| Anne Arundel County | 24,457 | 28,526 | 323,280 | 337,500 |
| Prince George's Co. | 21,138 | 26,451 | 695,020 | 710,100 |
| Montgomery County | 20,563 | 24,759 | 566,030 | 589,900 |

although the City is no longer the overwhelming leader in population, we take judicial notice of the fact that its courts still consider the predominant amount of law cases.[11] However, conditions have changed in the circuit courts in the counties as today they are generally better staffed, housed and equipped, and are essentially in continuous session to hear all types of cases including those brought at law. Therefore, the county circuit courts can now cope with an increase in cases removed from the City to their dockets, especially if their varying caseloads were considered when cases were transferred. *See* Rule 1200 c 2 (b). We add that if the impetus for the removal provision was to relieve the crowded dockets of Baltimore City, then the constitutional provision should have directed that there would be automatic removal from the City's courts to those of the counties, instead of, as now exists, allowing cases to be passed on paper between overburdened City courts. Variations in caseload size, facilities, procedures and the number of judges thus cannot today (if in fact they ever did) provide a rational basis for the inequality which flows from Article IV, section 8.

It would be incorrect to reason that this inequality is justified because Baltimore City litigants would abuse the privilege of automatic removal more than litigants elsewhere in the State. This is true because, as has been noted by cases and commentators alike, the use of the provision "for delaying purposes and other obscure ends," Comment, *Change of Venue Between Courts in Baltimore City,* 33 Md.L.Rev. 116, 119 n. 22 (1973), has been prevalent throughout the State. *See Shreffler v. Morris,* 262 Md. 161, 163, 277 A. 2d 62 (1971); *Smith v. Fredericktown Bank & Trust Co.,* 258 Md. 141, 265 A. 2d 236 (1970); 2 *Poe, Pleading and Practice,* 79-80, § 103 (5th ed. 1925). It is noteworthy

---

| 11. | 1971-72 | 1972-73 | 1973-74 |
|---|---|---|---|
| Baltimore City | 7706 | 7043 | 6170 |
| Prince George's County | 2173 | 2245 | 2277 |
| Montgomery County | 1981 | 1896 | 2049 |
| Baltimore County | 2299 | 2411 | 2304 |
| Anne Arundel County. | 1067 | 1104 | 979 |

See Administrative Office of the Courts Annual Report 1973-74, at page 73.

that with the advent of Maryland Rule 542 a 3, effective June 1, 1972, which requires the filing of an automatic removal motion "within sixty days after the action is at issue," abuse has diminished.[12] *Shreffler v. Morris, supra.*

Having considered and rejected the preceding potential justifications for the removal inequality between Baltimore City civil law litigants and those elsewhere in the State as is permitted by Article IV, section 8 of the Maryland Constitution, and since no other rational basis is evident, we must conclude that whatever basis, if any, may have existed originally for the enactment has evaporated such that no reasonable justification now exists. Thus it is in violation of the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution. This constitutional right of automatic removal might be saved from interment were we able to read Article IV, section 8, as requiring that civil common law cases brought in the Eighth Circuit must, upon application, be removed only to a court outside Baltimore City. But such is not possible, as the pertinent part of this constitutional provision is clear in stating that in the discretion of the judge removal may be "to some other court having jurisdiction," be that court located within or without the City, and Article IV, sections 27 and 28, provide for three civil common law courts in the Eighth Circuit. It is this discretionary factor, which, when considered in light of our previous discussion, renders the pertinent portion of Article IV, section 8, unconstitutional on its face. Consequently, we hold that the portion of Article IV, section 8, which reads "and in all suits or actions at law, issues from the orphans' court, or from any court sitting in equity" and the other language relating to this (all of which is italicized in the constitutional provision quoted earlier in this opinion) is unenforcible so long as the present multiple civil common law court system exists in Baltimore City.[13]

---

**12.** For instance in Prince George's County in the year prior to this new rule, July 1, 1971 through June 6, 1972, there were 170 cases removed; whereas after the new rule, from July 1, 1974 through June 6, 1975, there were only 29 cases removed. This statistic is furnished by the Seventh Circuit Administrative Office.

**13.** Maryland Rule 542 implements this constitutional provision (using

The effect of this ruling, we hasten to point out, will in no way deprive or otherwise curtail the circuit courts of the counties or the circuit-level civil law courts of Baltimore City from exercising their common law discretionary power (which is subject to appellate review for abuse) to remove an action to another jurisdiction, within or without the circuit, in order to rid the case of any prejudicial barnacles which, because of local prejudice, passion or interest, may have attached; thus, as near as is reasonably possible, an action's consideration by a fair and impartial jury can be insured. *Shreffler v. Morris,* 262 Md. 161, 277 A. 2d 62 (1971); *Heslop v. State,* 202 Md. 123, 126, 95 A. 2d 880 (1953); *Negro Jerry v. Townshend,* 2 Md. 274, 278 (1852); *Price v. State,* 8 Gill 295 (1849). Likewise we mention that even though constitutional and unconstitutional provisions of a law are contained in the same section, the entire section or enactment is not invalid unless the provisions are essentially and inseparably connected in substance — a situation which is not true here. It thus becomes the duty of the court whenever possible to separate the valid from the invalid provisions; in performing this task we leave unscathed the remaining provisions of Article IV, section 8. *Clark's Park v. Hranicka,* 246 Md. 178, 185-86, 227 A. 2d 726 (1967); *Compensation Board v. Albrecht,* 183 Md. 87, 96, 36 A. 2d 666 (1944).

We now consider the subsidiary removal question raised by the petitioners — did the trial court abuse its discretion by refusing to send the case outside of the City for trial? We think, on the record before us, it did not. The prior decisions of this Court make it plain that a judge who orders the removal of an action has discretion in determining the precise court within or without the circuit to which the case will be sent and reversal will follow only when the record discloses clear abuse of that judgment. *Middleton v. Morgan,* 263 Md. 154, 158-59, 282 A. 2d 94 (1971); *Marzullo v. Kovens Furniture Co.,* 253 Md. 274, 276, 252 A. 2d 822 (1969); *Lee v. State,* 161 Md. 430, 432-34, 157 A. 723 (1931); *Blick v. Cockins,* 131 Md. 625, 627-28, 102 A. 1022 (1917); *Atl. &*

---

virtually the same language) and therefore our holding in this case with respect to section 8 is applicable to Rule 542.

*Georges C'k Co'l Co. v. Md. Co'l Co.,* 64 Md. 302, 304, 1 A. 878 (1885); *Weiskittle v. State,* 58 Md. 155 (1882). *See also* Rule 1200 c 2 (b). Other than making the naked allegation that the corporate petitioner was a "large Baltimore corporation well known to residents of Baltimore City . . . and possessed of extensive assets" which makes "sympathy for the [respondents] and prejudice against the [petitioners inevitable] . . . ," petitioners offer no evidence to support their request for removal out of the City.

We conclude that it would be tampering with reality for us to determine that in a jurisdiction having a population of more than three-quarters of a million people, a jury cannot reasonably be empaneled which will fairly and impartially determine the issues joined between these parties, particularly when there is no suggestion that the occurrence, the subject of this litigation, received extensive publicity. It is not to be presumed that an unbiased jury cannot be found. *Veney v. State,* 251 Md. 182, 196, 246 A. 2d 568 (1968), *cert. denied,* 394 U. S. 948 (1969); *Grammer v. State,* 203 Md. 200, 211, 100 A. 2d 257 (1953), *cert. denied,* 347 U. S. 938 (1954). Certainly a voir dire examination will satisfactorily determine whether any prospective juror would be untowardly influenced to the prejudice of the petitioners, and if so, then a challenge, either for cause or peremptorily, may be utilized to eliminate that person from the panel. In any event we have little difficulty in concluding that the petitioners have failed here to demonstrate by evidence, or otherwise, abuse of discretion by the trial court in refusing to remove the case beyond the boundaries of the Eighth Circuit. *Shreffler v. Morris,* 262 Md. 161, 170, 277 A. 2d 62 (1971).

## III

The remaining question is whether the trial court possessed power to reinstate the verdict and then provide for a remittitur after having previously granted a full new trial. The docket entries in this case enlighten us as to what took place and in pertinent part read:

"26 Apr. 1974  Verdict in favor of the Plaintiff, Alenetta Miller, for $650,000.00 and in favor of the Plaintiff, Mildred Leggett, for $1,297.50 as against both defendants.

26 Apr. 1974  Judgment on Verdict Nisi.

30 Apr. 1974  Defendant's Motion for a New Trial filed.

29 May 1974  Defendant's Motion for a New Trial 'Granted.' (Carter, J.). Memorandum letter of Court filed.

3 June 1974  Plaintiff's Motion for Re-Hearing and Authorities filed.

21 June 1974  Plaintiff's Motion for a Re-Hearing 'Granted.'

18 July 1974  Order of Court dated May 29, 1974 is stricken out and Motion for New Trial is 'Granted' unless a remittitur in the amount of $450,000.00 is filed. Memorandum letter of Court (Carter, J.) filed.

25 July 1974  Plaintiff's Remittitur in the amount of $450,000.00 filed.

25 July 1974  Judgment on Verdict made absolute in favor of the Plaintiff, Alenetta Miller, infant, etc., for the sum of $200,000.00 being the amount found by the jury less the amount of the remittitur, also Judgment on Verdict made absolute in favor of the Plaintiff, Mildred Leggett, for the sum of $1,297.50 both with interest from April 26, 1974 costs of suit as against both defendants."

Aside from the fact that, with our ruling on the damages question coupled with the petitioners' apparent acknowledgment of responsibility for the happening of the accident, this issue may now be moot, we hold that

ordinarily in a civil proceeding the trial court possesses the power to reconsider and correct any of its rulings, including those of the type here, until a final judgment becomes enrolled. *McLaughlin v. Ogle*, 53 Md. 610 (1880) (today, under Maryland Rule 625, a judgment becomes enrolled thirty days after its entry); *cf. Mezzanotte Const. Co. v. Gibons*, 219 Md. 178, 183, 148 A. 2d 399 (1959).

> *Judgment in favor of Mildred Leggett, individually, against the petitioners, affirmed.*
>
> *Judgment in favor of Alenetta Miller, infant, reversed and the case, as it pertains to her claim against the petitioners, is remanded to the Baltimore City Court for a new trial restricted to a reassessment of damages.*
>
> *Costs to be paid equally by the petitioners and respondents.*

*Murphy, C. J., concurring in part and dissenting in part:*

While I concur with Parts I and III of the Court's opinion, I respectfully dissent from the Court's holding in Part II that the so-called automatic removal provisions contained in § 8 of Art. IV of the Constitution of Maryland violate the equal protection clause of the Fourteenth Amendment to the Federal Constitution.

In *McGowan v. Maryland*, 366 U. S. 420, 81 S. Ct. 1101, 6 L.Ed.2d 393 (1961), the Supreme Court said: (366 U. S. at 425-426)

"Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on ground wholly irrelevant to the achievement of

the State's objective. State legislatures are presumed to have acted within their constitutional powers despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it . . . ."

It is fundamental in cases involving constitutional attacks based upon equal protection grounds that constitutionality is presumed in the absence of a clear and convincing showing by the party assailing a legislative classification that it does not rest upon *any* reasonable basis, but is essentially arbitrary. *Matter of Trader*, 272 Md. 364, 325 A. 2d 398 (1974) and cases therein cited. In my judgment the majority has strayed significantly from the import of these decisions and has concluded, unnecessarily and unwisely, that even though the appellants adduced no evidence bearing on the matter in the proceedings below, no reasonable basis conceivably exists for distinguishing between the scope of the automatic removal right granted to litigants in civil law cases in the Eighth Judicial Circuit from that authorized in the other seven judicial circuits of the State. That states are empowered to draw reasonable distinctions between subdivisions within its borders is indeed a well settled constitutional precept, *San Antonio Independent School District v. Rodriguez*, 411 U. S. 1, 28 n. 66, 93 S. Ct. 1278, 36 L.Ed.2d 16 (1973), and since the difference in treatment involved in this case is not so irrational as to be invidiously discriminatory on its face, I would not emasculate, as the majority does, a state constitutional classification which has stood for one hundred years by *sua sponte* taking judicial notice of matters of doubtful conclusive import. What the majority has done in this case is to excise all those provisions from § 8 of Art. IV of the Constitution of Maryland which afford litigants in civil law cases an automatic right of removal to another court upon mere suggestion in writing, under oath, that a fair and impartial trial cannot otherwise be obtained; under the Court's ruling, therefore, removal in civil law cases can hereafter only be

obtained upon an actual showing of prejudice. As neat as the surgery done by the majority on § 8 may be, and as much as I may applaud the result in terms of sound judicial administration, the opinion of the Court goes too far and accomplishes too much on a record devoid of supporting evidentiary justification. See *Matter of Trader, supra.*